HAWTHORNE, Justice.
 

 John Dorsey, Jr., Robert Green, and Marion Miller, all Negroes, were charged in a bill of indictment with the murder of one Hyman Barkoff, a white man. The defendant John Dorsey, Jr., was granted a severance on his own motion, placed on trial, convicted as charged, and sentenced to death. From this conviction and sentence he appealed, and for reversal relies on 11 bills of exception.
 

 Bill of Exception No. 1.
 

 On the trial of a motion to quash the bill of indictment, J. A. Palfrey, a witness for the State, gave the following testimony under direct examination by an assistant district attorney: “Q. Well, within the last two, three or four years, has Mr. Hogue had occasion to contact you for the purpose of giving him the names of persons of the colored race who might qualify for jury service in this Parish? A. Yes, sir. Mr. Hogue talked to me on that matter some years ago. I was summoned to come here to serve on the jury, that is, to appear before the Jury Commissioners, and at that time I saw Mr. Hogue, and later on Mr. Hogue was telling me what difficulty he had in getting colored jurors to serve.”
 

 To this testimony objection was made on the ground that “said testimony and evidence were inadmissible, irrelevant and hearsay, and further that if irrelevant [relevant], was [were] far too remote to be admitted and had no bearing or connection on or with the issue before the Court, and prejudicial to the rights of defendant John Dorsey, Jr., and his said co-defendant Robt. Green”.
 

 The trial court overruled said objection, to which ruling the defendant, John
 
 *933
 
 Dorsey, and his codefendant, Robert Green, through counsel reserved this bill of exception.
 

 It is to be observed that the case was not then on trial on its merits, and that the objection was made during the taking of testimony on a motion to quash filed by the defendants previous to trial; or, in other words, the question of guilt or innocence of the accused was not at this time before the court. If the trial judge erred — and on this point we express no opinion — , counsel for defendant have not called to our attention, and we cannot see, in what way such error was prejudicial to the substantial rights of the accused, how the same constituted a substantial violation of a constitutional or statutory right, or how it resulted in a miscarriage of justice.
 

 Article 557 of the Code of Criminal Procedure provides that: “No judgment shall be set aside, or a new trial granted by any appellate court of this State, in any criminal case, on the grounds of misdirectipn of the jury or the improper admission or rejection of evidence, or as to error of any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right.”
 

 In State v. Barnhart, 143 La. 596, 78 So. 975, it was held that a ruling on evidence may be in itself erroneous and yet disclose no such injury or prejudice to the defendant as would warrant the setting aside of the conviction.
 

 In the case of State v. Pierfax, 158 La. 927, 105 So. 16, 18, we find the following expression: “Even though a ruling of the trial judge be erroneous, it will not warrant the reversal of the verdict in the absence of some showing of resultant injury or prejudice. State v. Wren, 121 La. 55, 46 So. 99; State v. Waldron, 128 La. 559, 54 So. 1009, 34 L.R.A.,N.S., 809; State v. Higginbotham, 138 La. 366, 70 So. 328; State v. Hardy, 142 La. 1061, 78 So. 116; State v. Barnhart, 143 La. 596, 78 So. 975.”
 

 Aside from the fact that the error here, if any, was not in itself prejudicial, it is to be noted that the admission of incompetent evidence is not prejudicial if the facts which it tended to prove are subsequently proven by similar evidence in the record. State v. Higdon, 153 La. 374, 95 So. 868. In the present case, it was subsequently proven without objection, when Mr. Hogue was examined as a witness for the State, that he had contacted, and communicated with, the witness Palfrey for the purpose of getting the names of colored persons for the jury wheel.
 

 Bill of Exception No. 2.
 

 This bill of exception was reserved to the overruling by the trial judge of defendant’s motion to quash the indictment.
 

 In the motion to quash defendant alleges, among other.things, that he is a person of the colored or Negro race, and a resident of the Parish of Orleans, and
 
 *935
 
 that the grand jury which found the bill of indictment against him was composed entirely of persons of the white race, from a panel or venire of 75 names of persons, all of whom were also of the,white race; that more than one-third of the population, of said Parish of Orleans are persons of the colored or Negro race; that the general venire or panel from which the grand jury was drawn contained no names of persons of the colored or Negro race at the time said grand jury was selected, and that the State officials charged with the duty of providing the names of persons for the general venire deliberately excluded therefrom the names of persons of the Negro race who are residents of said parish and who are duly qualified to serve as,- and perform the duties of, grand jurors; that said State officials charged with this duty had, and have, systematically, unlawfully, and unconstitutionally excluded persons of the colored or Negro race from the grand jury for more than 25 years, solely and only because of their race and color, in .violation of Article 172 of the Code of Criminal Procedure of Louisiana, the Constitution of Louisiana of 1921, art. 1, § 2, and the Fourteenth Amendment to the Constitution of the United States, and that as a result thereof defendant was, and is being, clearly and manifestly deprived of due process of law, in violation of constitutional rights and guarantees granted to him by the State Constitution and the Fourteenth Amendment to the Constitution of the United States of America.
 

 Defendant also alleges that said bill of indictment was based on illegal evidence presented to, and received by, the grand jury, etc., but appears to have abandoned these grounds, as no evidence was taken thereon and the same have not been mentioned in briefs.
 

 The State appeared through the district attorney for the Parish of Orleans and filed a written answer to said motion to quash, in which answer it admits that the grand jury which found the indictment in this case was selected and appointed from a venire or panel of 75' persons, which venire or panel was furnished by the Jury Commissioners for the Parish of Orleans, and that, having no knowledge that the said panel or venire was composed of persons all of the white race, the State denies this allegation. This answer further denies any knowledge on the part of the State of the percentage of Negroes in the population of said parish, and denies that the general venire from which the panel of 75 names was drawn contained no names of persons of the colored or Negro race, and denies that the Jury Commissioners deliberately excluded from the grand jury panel the names of persons of the colored or Negro race who were residents of said parish and who were qualified to serve as grand jurors. It further denies that the Jury Commissioners of the Parish of Orleans have systematically, unlawfully, and unconstitutionally excluded persons of the colored or Negro race from the grand juries of said parish for more than 25 years, solely and only because of their race and color; and alleges that from the grand jury which indicted defendant there
 
 *937
 
 was no unlawful exclusion of persons of the colored or Negro race.
 

 The method for the drawing and selecting of jurors in the Parish of Orleans is found in the Louisiana Code of Criminal Procedure, which Code, after providing for the appointment of three persons to constitute a Board of Jury Commissioners, to be selected and appointed by the Governor from the registered voters of said parish, provides in Article 192 that: “The Jury Commissioners for the Parish of Orleans shall qualify all persons before their selection as jurors, but the judges of the several District Courts shall have the right to decide upon the competency of jurors.”
 

 Article 194, previous to its amendment by Act 151 of 1944, being the law at the time this general venire was drawn, read as follows: “The said Commissioners shall select at large, impartially, from the citizens of the Parish of Orleans having the qualifications requisite to register as voters, the names of not less than one thousand (1,000) persons competent under this Code to serve as jurors. A list of these names shall be prepared, certified to by the Commissioners, and kept as a part of the records of their office subject to the orders of the judges of the Criminal District Court of said Parish. The names on said list shall be copied on slips prepared for the purpose, with the number and address corresponding to that on the lists and shall be placed in the jury wheel from which the drawing is to be made. No name shall be canceled from said list or withdrawn from the jury wheel without an order of court, and the said list shall be a correct and perfect record of the names in the jury wheel. The said list shall be supplemented from time to time as the necessities of jury service may require. * * * ”
 

 Article 196 of said Code, with reference to the drawing and empanelling of grand juries in said parish, provides, among other things, that: “Not earlier than the fifteenth (15th) and not later than the twentieth (20th) day of February of each year, and not earlier than the fifteenth (15th) and not later than the twentieth (20th) day of August of each year, the said Commissioners * * * shall draw from the said wheel the names of not less than seventy-five (75) persons, which said names, upon a day next following said drawing, not a Sunday or a legal holiday or a legal half-holiday, shall be submitted by said Commissioners to the presiding judge of that section of the Criminal District Court whose turn it shall happen then to be, to impanel the incoming grand jury; and said judge, from the names thus submitted, shall select twelve (12) persons who shall constitute the Grand Jury for the Parish of Orleans for the Grand Jury term next ensuing. * * * ”
 

 The indictment against the defendant in this case was returned and filed in open court on December 8, 1943, by a grand jury which had been selected to serve from September, 1943, to March, 1944, from the grand jury panel of 75 names drawn by the Jury Commission in August, 1943. We find in the record a stipulation and agreement by the State and the defense that, of this panel of 75 names so drawn, 69
 
 *939
 
 persons- appeared in court at the trial- of the motion to quash the indictment and were examined, and, out of these 69, 68 testified that they were of the white race and one that he was of the colored race. In this stipulation it is further agreed and admitted that there were the names of 1360 persons in the jury wheel or general venire as of August, 1943, at the time of the drawing of the list of 75 from which the grand jury was selected, all of whom were duly, legally, and properly summoned to testify as witnesses on the trial of the motion to quash, 'and, out of these 1360 persons, 1034 appeared and testified in open court, and 946 were found to be of the white race and 88 of the colored race.
 

 We find also in the record a stipulation and agreement of counsel for the State and f-or defendant that the following documents were offered, produced, and filed in evidence in behalf of the defendant, John Dorsey, to-wit: (1) A list of 75 names for each grand jury panel from September, 1940, through March, 1944; (2) a list furnished by the Jury Commission for the Parish of Orleans of 1360 names, being the contents of the entire jury wheel, and (3) a certified document dated February 22, 1944, issued by the United States Department of Commerce, Bureau of the Census, Washington, D. C., which stated that the total population of the City of New Orleans for the year 1940 was 494,537, of which 344,775 were white and 149,034 were Negroes, and that the total population of the city for the 'year 1930 was 458,752, of which 328,446 were white and 129,632 were Negroes.
 

 The trial judge denied the motion to quash, giving his reasons as follows:
 

 “The Motion to Quash the Indictment filed herein on behalf of the defendant,. John Dorsey, is denied. The Motion is. based on allegations made by the defendant, John Dorsey, that he has been deprived of the equal protection of the law, guaranteed him under the State and Federal Constitutions. It is alleged that the Jury Commissioners for the Parish of Orleans systematically, designedly, intentionally and fraudulently excluded persons of the negro race from the General Venire from which the Grand Jury Panel of seventy-five (75) names was drawn, and from which the Grand .Jury Panel, the late and lamented Honorable Judge J. Arthur Charbonnet, Judge of Section ‘E’ of the Criminal District Court for the Parish of Orleans, selected and appointed the Grand Jury that indicted the defendant. It is charged and alleged in the Defendant’s Motion to Quash that the General Venire from which the Grand Jury Panel was drawn, did not contain the name of any Juror of the negro or colored race. Every opportunity was given the defendant to prove the charge of discrimination. The entire General Jury Venire consisting of nearly one thousand three hundred (1300) persons was summoned for appearance in -open Court to give the defendant an opportunity to prove the contention of discrimination. Of these nearly .one thousand three hundred (1300) persons, more than one thousand (1000) appeared in Court for examination, and at a hearing held from day to day it was revealed that considering the economic,
 
 *941
 
 'the moral, the educational, and other general conditions prevailing in the negro population in the Parish of Orleans, the General Venire contained a fair percentage ■of persons of the negro race.
 

 “The hearing showed that in the exercise of their discretion, the Jury Commissioners accepted persons of the white race for Jury Service for the same reasons that persons of the negro race were accepted, and rejected persons of the white race for the same reasons that persons of the negro race were rejected, without discrimination in either case.
 

 “The hearing revealed that more than nine (9%) percent of the names of the persons in the General Venire were of the negro race, and that while negroes may have been discriminated against in their exclusion from Jury Service in the Parish of Orleans in the past, the Court is of the firm opinion that since the Norris ■decision [Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074] by the Supreme Court of the United States and more particularly since the Pierre case, [Pierre v. State of Louisiana] 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757, the Jury Commissioners for the Parish of Orleans have not only not intentionally excluded negroes from Jury Service, but that they have made a sincere and honest effort to place in the Jury Wheel persons of the negro race who are qualified for Jury Service.
 

 “It was shown that the average percentage of negroes in the Federal Jury Box in the Eastern District of Louisiana, where the legal qualifications for Jury Service are the same as in the State Courts, is five (5%) percent, while the percentage in the State Courts in the Parish of Orleans is nearly doubled that percent; as a result of an honest and industrious effort on the part of the-Jury Commissioners for the Parish of Orleans to obtain persons of the negro race for Jury Service.
 

 “For these reasons and others shown by the record, the Motion to Quash is denied.”
 

 The qualifications to serve as a grand juror or a petit juror in the courts of this State are set out in Article 172 of the Code of Criminal Procedure, as follows:
 

 “To be a citizen of this State, not less than twenty-one years of age, a bona fide resident of the parish in and for which the court is holden, for one year next preceding such service, able to read and write the English language, not under interdiction or charged with any offense, or convicted at any time of any felony, provided that there shall be no distinction made on account of race, color or previous condition of servitude; and provided further, that the District Judge shall have discretion to decide upon the competency of jurors in particular cases where from physical infirmity or from relationship, or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case.
 

 “In addition to the foregoing qualifications, jurors shall be persons of well known good character and standing in the community.”
 

 
 *943
 
 The first question for our determination is whether or not the Jury Commission for the Parish of Orleans, charged with the duty of selecting names of persons for the general venire list, from which the grand jury panel of 75 names was drawn, and from which the grand jury was selected which indicted defendant, systematically, unlawfully, and unconstitutionally excluded therefrom persons of the colored or Negro race, solely and only because of their race and color, in violation of Article 172 of the Code of Criminal Procedure, the Constitution of the State of Louisiana, and the Fourteenth Amendment to the Constitution of the United States of America.
 

 On the trial of the motion to quash, the members of the Jury Commission which qualified and selected the general venire of 1360 names placed in the jury wheel, from which the grand jury that indicted defendant was selected, and former members of said Commission testified almost without exception that there was no discrimination between members of the white and colored races in the selecting and qualifying of jurors. In fact, the record does not show any testimony by these Commissioners, past or present, to the contrary. However, in order to determine this question it is necessary for us to ascertain the manner or way in which the said general venire was selected and qualified; whether said Commission made any investigation, inquiry, or effort to ascertain how many Negroes were qualified to serve as jurors, and whether it discharged the duty placed upon it by the constitutional provisions in question, as construed and applied by the highest court in our land— all from the record and facts before us in this case.
 

 The record discloses that the Jury Commission, in securing the names of prospective jurors, used registration rolls, telephone directory, city directory, newspapers, Federal jury rolls, and in addition thereto requested various insurance companies, executives, etc., to furnish the Commission with a list of names of persons for jury service, and that none of these lists' or sources designated the race or color of the individuals whose names appeared thereon. After these lists were secured, each individual whose name appeared thereon was sent a subpoena to appear before said Commission so that the Commission might ascertain his qualifications and hear any excuses or reasons, legal or otherwise, why said individual could not serve as a juror. Upon appearing before the Commission, each person filled out a questionnaire, which did not in any manner designate his race or color, and, if he were found to be qualified and not excused from service, his name was then put on the general venire list and placed in the wheel for drawing as a qualified juror.
 

 The Jury Commission accepted persons of the white race for jury service for the same reasons for which it accepted persons of the Negro race, if found to be qualified under the law, and rejected persons of the white race for the same reasons for which it rejected persons of the Negro face, without discrimination in either case.
 

 
 *945
 
 The above clearly shows the efforts made by the Jury Commission to obtain qualified jurors for the general venire list. However, in the case of Negroes, the Commission went even further, and contacted various colored insurance companies, leading members of the colored race, colored business and fraternal organizations, and every other source available to it, in an ■effort to secure the names of qualified Negroes so that it could place the same in the jury wheel, in compliance with law.
 

 In this connection, we find in the record the testimony of William Dillon, chairman of the Jury Commission from 1928 to 1940, that of J. W. Hogue, present chairman and a member of said Commission since August IS, 1940, and of Walter E. Douglas, a member of said Commission since March, 1943. We think it appropriate and proper to quote from their testimony, given under ■oath, along this line.
 

 Mr. Dillon:
 

 “Q. Of your own knowledge could you give us any idea of the percentage of negroes in the jury wheel as to whites? A. No sir, but I can say this: We made ■every effort possible to place the names of negroes in the wheel when it was impossible to secure negroes from the registration rolls, telephone book or city directory. We went to the fraternal organizations, negro insurance companies on Dry.ades and North Claiborne Streets; also to the leaders of the negro associations, men like Dr. Harder; we asked that he give us the names of the better negroes to qualify. We had qualifying days for negroes; we had them crowded from the jury commission’s office out to Broad Street; most of them were employed by the hour as laborers; all said they were on an hourly basis, and it was up to the Jury Commissioners to qualify or excuse them. After close examination and telling them of the importance of their race serving as jurors, they asked to be excused. * * * After Justice Black’s decision we used every effort to put more negroes on the panels. We did everything possible to encourage them to have their names put in the wheel.
 

 “Q. Was that subsequent to the Pierre decision? A. Well, after that decision it was more, but before that we always qualified negroes as jurors.
 

 “Q. Then your testimony is that the names of negroes in the wheel would be about ten per cent? A. That, I couldn’t say; there was no way of telling. * * *
 

 “Q. I understood you to say that when persons of the colored race came over to the Jury 'Commission for the purpose of qualifying, that a good number of them were excused because of the fact that they were working by the hour? A. Yes sir, as laborers, on the river front, and they begged in every way to be excused, urging loss of time and wages.
 

 “Q. Were not white persons excused for the same reasons? A. Yes sir, absolutely the same reasons.
 

 “Q. And there was no discrimination as to color or race because some of them were working by the hour? A. Yes sir,
 
 *947
 
 no discrimination; they were all excused for the same reason. * * *
 

 “Q.
 
 Is it or not a fact that on several occasions that colored men came to your office and asked to be placed on the jury? A. No sir, very seldom. We only had two colored men in twelve years to come up and' volunteer, and one colored man named Bayard, he asked to be placed on the jury.
 

 “Q. Was he placed on the jury? A. Yes sir. * * *
 

 Mr. Hogue:
 

 “Q. You stated that you could not determine how many were of the white or colored race when you subpoenaed them. How do you obtain your lists of prospective jurors? A. We have gone completely through the City Directory, the Telephone Directory, the Registration Rolls. We have gone further in the case of negroes. We have gotten lists from various negroes of high standing, who have submitted names to us. I will give you an example of the difficulty. For instance, we get quite a few names from' the newspapers. I never let an election of officers of any club or homestead, or business concern go by unless I check, and if it happens to be a white organization we can always find the address somewhere, but lots of times in the case of negro organizations I have copied the names down carefully, but it has been impossible to find where they lived, and if you do find them you already have them in your list. * * *
 

 “Q. Well now, Mr. Hogue, do you make any special effort to get negroes on the jury? A. We do.
 

 “Q..
 
 What do your efforts consist of in that connection? A. We have contacted various insurance companies, various upstanding members of the colored, race, and asked them for lists, and for instance, insurance companies, businesses;, that composes the biggest part of your, I would say, sources of getting colored jurors, the insurance companies and. the—
 

 “Q. You mean colored insurance companies?
 
 A.'
 
 Yes, sir. Now, some of them' are in connection with mortuary concerns;' but we have exhausted every means that we know of.
 

 “Q. To do what? A. To get colored, jurors.
 

 “Q. And as a result of your efforts, you have been able to provide names of: colored persons in the jury wheel; is-that right? A. That’s right. * * *
 

 “Q. Have you in any way, shape or form, made any effort to exclude negroes, from the jury wheel in the Parish of Orleans ? A. Absolutely not.
 

 “Q. Well, would you say, on the contrary, that you made special efforts to get names of negroes in the jury wheel of the-Parish of Orleans? A. I will positively say yes.
 

 “Q.
 
 What have those efforts consisted' of? A. Every effort that I know of that' can be used to get qualified colored jurors, has been used. I don’t know of any method we could use to get any more jurors, unless-we would actually discriminate against the negro to put him in the wheel.
 

 “Q. In other words, you have gone out: of the way to the extent of contacting in
 
 *949
 
 •surance companies, colored insurance companies, and leaders in the midst of the '•colored population, for the purpose of their •giving you names of negroes who might •qualify for jury service; is that correct? A. That’s correct. * * * ”
 

 Mr. Douglas:
 

 “Q. Now, Mr. Douglas, the motion to •quash, filed in this matter on behalf of these two defendants, charges that the Jury Commissioners have unlawfully excluded from jury service persons of the ■colored race. What have you to say about ■that? A. No sir, not to my knowledge. 'There is no way under the sun that it ■could have been done.
 

 “Q. In other words, the same qualifications and the same tests are applied to ■colored people as are applied to persons of ■the white race in the placing of names in •the jury wheel? A. Yes sir.
 

 “Q. As a matter of fact do the Jury '•Commissioners make a real, unusual effort to get persons of the colored race in •the jury wheel? A. Yes sir, they have, .since I have been there, and I am told they ■ did prior to that time. They have selected .those men there by every available means .at their disposal; they have tried to get names from every possible source. We .have to try and sell some of them to serve .on juries. They all want to be excused. * * ”
 

 It is to be noted that the witness Hogue was chairman of the Jury Commission at -the time the list of 1360 names was placed in the jury wheel, from which 75 names were drawn for the grand jury panel, from which 75 persons 12 were selected as the grand jury which returned the indictment against the defendant in this case.
 

 The general venire list does not designate the race or color of any individual whose name appears thereon, and therefore there is no proof of the actual percentage of colored persons whose names are in the jury wheel from time to time. However, we are convinced from a careful reading of all the testimony that a fair percentage of the members of the colored race was contained therein, especially when we take into consideration the economic, the moral, the educational, and other general conditions prevailing among the colored race in the Parish of Orleans. And we are entirely convinced that this has been true since the decision of the United States Supreme Court in 1939 in the case of Pierre v. State of Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757. This is proven conclusively by the fact that since 1940 the names of members of the colored race have been drawn from the jury wheel for service as grand and as petit jurors. In this connection, we quote from the testimony of two of the present members of the Jury Commission and from that of one of the judges of the Criminal District Court for the Parish of Orleans, as follows:
 

 Mr. Hogue:
 

 “Q. As to each one of those panels, six panels, do you know of your own knowledge whether or not there were any colored men or members of the colored or negro race on any of those panels? A. I can tell you positively that there were negroes on the panels. Which ones, I don’t
 
 *951
 
 know, and whether on all of them; I couldn’t say, but they were in the wheel.
 

 “Q. Could you tell us of your own knowledge how many persons of the negro race were on that panel in the wheel at the time they were drawn? A. That would be physically impossible due to the fact there is no notation made; and the laws that govern the Jury Commissioners state that there shall be no discrimination as to color, race or creed. Both whites and negroes are qualified under the same conditions and excused for the same reasons. *
 
 *
 
 *
 

 “Q. And you state that the names of the persons in the jury wheel, consisting of one thousand or more names from which the grand jury panels are drawn, contain the names of white and colored people? A. Yes sir.
 

 “Q. And that there is no discrimination at all made with reference to putting the names in the jury wheel? A. That’s right.
 

 “By the Court:
 

 “Q. Were there names of colored persons in the wheel when the present grand jury panel was drawn? A. Yes, sir. *
 
 t.
 
 * ”
 

 Mr. Douglas:
 

 “Q. Since you are in office, have you qualified any jurors? A. Yes sir, quite a few.
 

 “Q. Have you ever qualified any negroes? A. Yes sir, quite a few. There are three jury commissioners. I have qualified quite a number of them, but I cannot say exactly. On a Monday morning we may qualify as many as sixty or seventy men; in Friday there might be one hundred and twenty-five or one hundred and fifty. I can say definitely that they qualified quite a few negroes and their names have been put in the jury wheel. * *
 
 *
 

 Judge William J. O’Hara:
 

 “Q. Well, Judge, from your personal observation and from your personal experience around the Criminal Courts, have you noticed that since the Scottsboro decision and the Pierre case the names of negroes have appeared on the names of the panels which have been submitted to the Judges by the Jury Commissioners? A. Yes, sir. Ever since the Scottsboro case, the names that have been certified to us by the Jury Commissioners from time to time contain negro citizens as jurors and prospective jurors. Now, I would say this, that since 1940 we have had more colored citizens as jurors than we had before 1940. The Jury Commissioners had some little difficulty when they first started in getting started with colored jurors. In other words, they built up a certain amount of colored prospects, and then the 1940 Commission has built further on that foundation and we have considerably more colored jurors since 1940 than we had before that time. * * * I selected the last Grand Jury, and I had about seven or eight negroes among the 75, but I thought there were certain other men on there who happened to be white men who were more eligible for Grand Jurors than those particular eight; in fact, one of them was a porter; several of them wanted to be excused; they could not serve
 
 *953
 
 at all. So, I would not say that there are no negroes in the community who are not good enough to be on the Grand Jury. I am sure there are. I will say that in fairness to the record.”
 

 It is to be noted that in the United States District Court for the Eastern District of Louisiana, which district includes the Parish of Orleans as well as a good many country parishes, the proportion of the names of Negroes in the general venire box runs about 5 per cent, with the qualifications for jury duty the same as they are in the State courts. And it certainly is to be presumed that the officials whose duty it is to draw and select jurors in the Federal court have performed their duties according to law and have not discriminated against the members of the Negro race solely because of race and color, and that these officials have performed their duties fairly, conscientiously, and with no thought of discrimination. And, if this be true, from the record in the case before us, where the names of Negroes in the jury box constitute approximately 9 per cent, it cannot be said that the Jury Commission for the Parish of Orleans has discriminated against Negroes solely because of their race and color.
 

 Assuming for the sake of argument that the Jury Commissioners did not give the Negro race a full pro rata with the white race in the selection of juries — which we do not concede — , we find that the Supreme Court in the case of Thomas v. Texas, 212 U.S. 278, 29 S.Ct. 393, 394, 53 L.Ed. 512, had this to say: “It may be that the jury commissioners did not give the negro race a full pro rata with the white race in the selection of the grand and petit jurors in this case; still this would not be evidence of discrimination. If they fairly and honestly endeavored to discharge their duty, and did not in fact discriminate against the negro race in the selection of the jury lists, then the Constitution of the United States has not been violated.”
 

 We conclude that the record on this bill is barren of any testimony tending to show that any Negro was excluded from the general venire because of his color or race, but, on the contrary, the evidence proves that the Jury Commission for the Parish of Orleans fairly and honestly endeavored to discharge its duty and did not in fact discriminate against the Negro, in the selection of the general venire, and that it has not violated the provisions of the Code and of the Constitutions of the State and the United States.
 

 ~ On the grand jury panel of 75 names, being the panel from which the grand jury which indicted the defendant herein was selected by the district judge, we find the name of one member of the colored race. However, defendant complains that there was no Negro on the grand jury that found the indictment, and alleges that there has not been a Negro on a grand jury in the Parish of Orleans for a period of 25 years. Under the facts in this case, this complaint simply means that defendant is claiming the right to have a jury composed in part of members of his own race. This we do not understand to be the law. So to hold under the facts in this case would be tantamount to saying that it was the
 
 *955
 
 mandatory duty of the district judge to place on the grand jury which found the indictment the member of the colored race who was on the jury panel.
 

 In Commonwealth of Virginia v. Rives, 100 U.S. 313, 322, 25 L.Ed. 667, the Supreme Court of the United States said: '“It is a right to which every colored man is entitled, that, in the selection of jurors to pass upon his life, liberty, or property, there shall be no exclusion of his race, and no discrimination against them because of their color. But this is a different thing from the right which it is asserted was denied to the petitioners by the State court, viz. a right to have the jury composed in part of colored men. A mixed jury in a particular case is not essential to the equal protection of the laws, and the right to it is not given by any law of Virginia, or by ■any Federal statute. It is not, therefore, guaranteed by the Fourteenth Amendment, •or within the purview of sec. 641.”
 

 It is the duty of the district judge in the Parish of Orleans to select a grand jury of 12 from the grand jury panel of 75 names, and in doing so he should select -the most competent and best qualified per-sons from the list submitted to him by the Jury Commission. In fact, it is his duty so to do, and in performing this duty he has a wide discretion. The record in this case is barren of evidence showing any abuse by the district judge of this discretion.
 

 Bill of Exception No. 3.
 

 This bill of exception was reserved to a ■ruling of the trial judge denying or recalling a rule filed on the district attorney to show cause why the attorney for the defendant should not be permitted and allowed to see, read, and copy a written confession alleged to have been made by the said John Dorsey and in possession of the district attorney. A hearing was had on the rule on April 24, 1944, the day before the case was fixed for trial on its merits, at which hearing the district attorney, being called as a witness, testified as follows:
 

 “Q. You are the District Attorney for the Parish of Orleans? A. Yes, sir.
 

 “Q. The defendant John Dorsey is now confined in the Parish Prison under an Indictment for Murder ? A. Yes, sir.
 

 “Q. Do you intend to prosecute this case to-morrow? A. Yes, sir.
 

 “Q. Have you in your possession an alleged confession of this defendant, alleged to have been made by him to certain members of the Police Department? A. Yes, sir.
 

 “Q. Do you intend to use that confession during the trial of this case ? A. Yes, sir.
 

 “Q. Will you let me see that confession ? A. I will not, sir.”
 

 In his application for the rule to show cause, the attorney for the defendant John Dorsey alleges that the district attorney had in his possession a confession alleged to have been made by the defendant John Dorsey to certain members of the New Orleans Police Department at a time when defendant was without counsel and did not have the benefit of counsel, and that the said district attorney would attempt to
 
 *957
 
 use said alleged confession and endeavor to have the same produced, introduced, and filed in evidence before the trial jury as evidence against the defendant, and that he, -said attorney for the defendant, had requested permission of the district attorney to see, read, and copy said alleged confession before the trial of said defendant, which permission was denied; that the knowledge of the contents of said alleged confession was important and material to mover therein in the proper preparation of the defense of said defendant, and that the refusal and denial of said request by- the district attorney was illegal, unlawful, and tantamount to depriving defendant of a fair and impartial trial, in violation of his constitutional rights.
 

 The State contends in brief and in argument before this court that the written confession in question is a public document within the meaning of Act 195 of the Louisiana Legislature of 1940, commonly known as the “Public Records Act”. This act, after defining what are public documents, grants the privilege of examining, copying, photographing, and taking memoranda of such public records. But the State contends that this right of inspection does not apply to such a written confession under the express terms of Section 3 thereof.
 

 Section 1 of the act reads as follows: “Be it enacted by the Legislature of Louisiana, That all records, writings, * * * and papers, and all copies or duplicates thereof, * * ..* prepared for the use in the conduct * * * or performance of any * * * duty or function, * * * performed by or under the authority of the Constitution or the laws of the State of Louisiana, * * * be and the same are hereby declared to be public records, subject to the provisions of this Act, except as hereinafter provided.”
 

 Section 3 provides: “That the provisions, of this Act shall not apply to public records,, as defined herein, when the same are held by any sheriff, district attorney, police officer, * * * as evidence in the investigation for or prosecution of a criminal charge,, until after such public records have been, used in open court or the criminal charge has been finally disposed of; nor shall this-section be construed as forbidding said’, officers * * * to make public anything they are otherwise legally authorized to-make public * * *.”
 

 From a reading of Section 1 of this act,, it would seem that the document here iff question, namely, a written confession, is a public record, being a writing prepared: for the use in the conduct and performance of a duty performed by or under the authority of the Constitution and laws of the State of Louisiana. And, if so, Section 3 of said act is applicable, and the district attorney was not required to grant to counsel for the defendant the privilege of examining, copying, etc., the document until the same had been used in open court.
 

 However, a careful reading of the-act as a whole has convinced us that a written confession in the hands of the district attorney, before it is used in open, court, is not a public document within the meaning of the act.
 

 
 *959
 
 The act provides in Section 7 that the only persons authorized to exercise the privilege of inspecting public records are the electors and taxpayers of the State of Louisiana or their duly authorized agents, and provides in Section 14 that any elector or taxpayer, who, after exercising the privilege granted by the act, shall violate any of the provisions thereof, shall be guilty of a misdemeanor and punishable by a fine or imprisonment or both, and shall forfeit the privilege granted by the act for a period of six months. Moreover, the act in Section 12 makes it the duty of all persons having custody or control of any public record to preserve such record with diligence and care for a period of at least 12 years from the date on which such public record is made.
 

 In our opinion, from a careful study of the entire act, it is evident that a written confession of a defendant in the hands of the district attorney, before it is used in open court, is not a public document within the meaning of an act which contains such provisions as these.
 

 Since we have concluded that a written confession of a defendant in the hands of a district attorney, which the State expects to use and offer in evidence at the trial of such defendant, is not a public document within the meaning of Act 195 of 1940, then was the accused in this case entitled, as a matter of right, to see, inspect, copy, and read said alleged written confession for the purpose of the proper preparation of his defense, and was the refusal of his request for such inspection tantamount to depriving him of a fair and impartial trial?
 

 At common law no right of inspection of documents before trial was conceded to the accused. In King v. Holland, 100 King’s Bench 1248, 4 Term Reports 691, decided in England- in 1792, the defendant was denied an opportunity of inspecting documentary evidence intended to be produced against him upon a public prosecution, this case being decided under the common-law rule set forth hereinabove.
 

 We have been unable to find, nor have counsel called our attention to, or cited, any case in Louisiana directly in point with the facts in the case at bar — that is, on the issue of whether or not a defendant is entitled, as a matter of right, to the inspection, prior to trial, of a written confession allegedly made by him. However, we do find that a good many states in the Union still follow the common-law rule with reference to the inspection of a written confession of a defendant in a criminal case at the beginning of, or previous to, trial.
 

 In Davis v. State, 99 Tex.Cr.R. 517, 270 S.W. 1022, decided on March 11, 1925, by the Texas Court of Criminal Appeals, the right of inspection was denied, the court stating that it was advised of no law which would require it, at -the beginning of the trial, to command counsel representing the State to deliver the confession to counsel for defendant for inspection.
 

 In State v. Yeoman, 112 Ohio St. 214, 147 N.E. 3, decided on March 17, 1925, by the Supreme Court of Ohio, this right of inspection was denied, the court stating
 
 *961
 
 that it was unable to see how a denial of such inspection and copy would seriously interfere with the rights of the defendant, and that these rights could be safeguarded on the trial by permitting counsel for the defendant to inspect the written confession after the prosecuting attorney, having proven that the confession in his possession was signed by the defendant, should offer it as evidence tending to establish proof of guilt or should examine a witness in relation thereto.
 

 In the case of State v. Kupis, 7 W.W. Harr. 27, 179 A. 640, 641, decided on May 21, 1935, the Court of Oyer and Terminer of Delaware, in dealing with the same question, said: “The granting of the application would be contrary to all practice and would lead to dangerous results. It is, therefore, refused.”
 

 To the same effect is the holding in the case of People v. Skoyec, 183 Misc. 764, 50 N.Y.S.2d 438, 440, decided by the Supreme Court of New York on October 7, 1944. In that case the court said: “Until the Legislature extends the power of courts to permit the defendant in a criminal case, to inspect a confession prior to trial, the Courts should not exercise that power, unless unusual circumstances demand it.”
 

 In briefs filed in this court on behalf of the defendant in the case at bar, our attention has been called to the case of State v. Murphy, 154 La. 190, 97 So. 397, counsel stating that this court held in that case that the accused was entitled to an examination of a stenographic report of his confession. A careful reading of that case as reported and an examination of the original record filed in this court led us to the conclusion that the cited case is not in point. Under the facts therein, the confession in question had been given in the lobby of the jail and was taken down by a stenographer. At the trial the State elected to prove this same confession, not by the production thereof, but by the testimony of witnesses who were present and had heard the same, or by parol evidence, the State taking the position that the written confession had been incorrectly transcribed and contained many errors. Counsel for the defendant requested the State to produce for his inspection and examination the stenographic report of said confession, which was refused in the lower court. This court, in setting aside the conviction, held that the State should have produced the same, as the correctness thereof should have been determined by the trial court and the jury if it had gone to them, and that the State should not have been permitted to say that said stenographic report was correct or incorrect.
 

 According to Wigmore on Evidence, 3d Ed., Volume 6, Section 1850, some states in this country have by statutes expressly changed the common-law rule given above with reference to the inspection of documentary evidence. But, according to the same authority, in England no express statute was needed, as the change came to pass indirectly as a result of the pre-trial procedure before the committing magistrate (the grand jury procedure being no longer in use). And with reference to this change of procedure, we are very much impressed
 
 *963
 
 with'the following extract from a lecture given by the Honorable Charles S. Whitman, attorney, judge, and former governor of New York, found in the above-cited section :
 

 “In England, the examination before the Magistrate, in every crime, all crimes, is thorough, exacting and complete. The Magistrate is obliged to examine every witness that can be brought before him by the Crown, by the prosecution. That examination must be held in the Magistrate’s Court. * * * All of the witnesses are heard, for both sides. The defendant may produce witnesses or may not, but he may insist on having called all the witnesses he desires. * * * The case comes to the Old Bailey, a criminal court, corresponding in some degree to our criminal courts here. * * * The depositions are returned to the Old Bailey; all of them; both sides. All these depositions are at the disposal of the Crown Counsel and the counsel for the defense.
 

 “ * * *
 
 All of the evidence in the possession of the Crown is in the possession of the counsel■ for the defendant. He knows all that the Crown knows. He has all the evidence in his possession before the witness goes on the stand. He has all the evidence that can be presented in that court at trial, before the trial begins.
 
 * * * ” (Italics ours.)
 

 From the above it would appear that the common-law rule on this point has been-changed or greatly relaxed in England as a result of this pre-trial procedure. And we see no necessity for following the old common-law rule in this State, in the absence of any prohibitory statute or decisions of this court on the point, solely and only for the reason that several states in the Union continue to do so.
 

 The defendant by his plea of not guilty denied his guilt, and his counsel in the rule filed herein set forth that. the knowledge of the contents of said confession was important and material in the proper preparation of the defense of said defendant, and that the district attorney’s refusal and denial of the request to see, read, and copy said alleged written confession was tantamount to depriving the defendant of a fair and impartial trial, and was illegal and unlawful.
 

 Every defendant in a criminal case is presumed to be innocent until the contrary appears, and it is the policy of the law to give to every man accused of a crime a reasonable opportunity to prepare and present his defense to the court or the jury. The State of Louisiana does not want to secure convictions by any unfair concealment or surprise. It is the duty of the State to concern itself as much in having the innocent acquitted as in securing the conviction of the guilty, and the State is desirous of giving every accused person a fair and reasonable opportunity to make his defense. This being so, we are of the opinion that a pre-trial inspection of defendant’s own written confession is a just and fair concession which should be made in this State.
 

 The courts in other jurisdictions in the cases cited hereinabove, in refusing pretrial inspection of a defendant’s written
 
 *965
 
 ■ confession, have stated that such refusal does not constitute prejudicial error; that there is no law permitting any such practice; that such inspection might have •dangerous results, and that such inspection should not he granted except in unusual circumstances. We concede the possibility of manufacturing a refutation of a confession after inspection and before trial. However, even conceding this, we do not •think that this fact and the reasons above set forth by the courts of other states should outweigh the danger of convicting an innocent accused, and it is our opinion that to permit such an inspection is nothing less than is required by fairness to a defendant under the presumption of innocence.
 

 In reaching the conclusion that we have in this case, we have fully considered Section 976 of the Revised Statutes of 1870, said section being merely a re-enactment of Section 33, Chapter L, of the Acts of 180S. This section provides, among other things, that the method of trial, the rules of evidence, and all other proceedings in the prosecution of crimes, offenses, and misdemeanors, “changing what ought to be changed”, shall be according to the common law, unless otherwise provided.
 

 Under the provisions of the Constitutions of the United States and this State, every accused is entitled to, and is guaranteed, a fair trial, and to deny his counsel a pre-trial inspection of accused’s written confession is, in our opinion, tantamount to depriving such accused of a fair trial, and is in violation of his constitutional rights. This being so, Section 976 of the Revised Statutes must yield in so far as it may deny this right.
 

 It is not otir intention to overrule the prior jurisprudence of this State, and particularly the various cases cited by counsel for the State, in each of which defendant was denied pre-trial inspection of written confessions of codefendants, written statements of witnesses, or police reports in the hands of a sheriff, police department, or district attorney, and we do not overrule these cases.
 

 However, we are of the opinion that in this case the rule filed on behalf of defendant should have been made absolute, and that his counsel should have' been permitted to see, inspect, and copy his client’s alleged written confession previous to the trial on the merits, all under the supervision and control of the trial judge and at a time and place fixed by an order of the court. ■
 

 Having concluded that the bill under consideration has merit, and that the verdict and sentence should be reversed and set aside and a new trial granted, we see no reason to consider any one of the remaining bills of exception.
 

 For the reasons assigned, it is ordered, adjudged, and decreed that the verdict of the jury and the sentence of the court are annulled and set aside; a new trial is granted, and the case is remanded .to the lower court for further proceedings consistent with the views herein expressed.