**Application of John Henry TUNE, for a Writ of Habeas Corpus.**

**No. 11630.**

United States Court of Appeals
Third Circuit.

Argued Nov. 2, 1955.

Decided March 6, 1956.

884

Charles Danzig, Newark, N. J., for appellant.

Charles V. Webb, Jr., Newark, N. J. (Grover C. Richman, Jr., Atty. Gen., of New Jersey, C. William Caruso, Sp. Legal Asst. Prosecutor, Newark, N. J., on the brief), for appellee.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

Petitioner, John Henry Tune, presently incarcerated under sentence of death in the New Jersey State Prison, Trenton,

New Jersey, was denied a writ of habeas corpus by the United States District Court for the District of New Jersey. The necessary certificate of probable cause required by Section 2253 of Title 28 of the United States Code was issued by the district court, and Tune has appealed to this court. He contends that the district court erred in holding that none of his federal constitutional rights were violated during the process of his arrest, trial, and conviction, and raises here questions which were considered in the district court. The petitioner had previously exhausted his state remedies, including an application for certiorari which was denied by the United States Supreme Court.[1]

William Prather was found dead in the cellar of his home in Irvington, New Jersey, during the early morning of Saturday, August 23, 1952. In the afternoon of the same day, petitioner was taken into custody, and sometime between 3 and 5 a. m. Sunday, August 24, he signed a fourteen-page, detailed statement which contained admissions as to how and when he had killed Prather. On Monday, August 25, 1952, petitioner was arraigned, and on October 7, 1952, he was indicted. On October 30, 1952, about two months and one week after petitioner's arrest and his signing of the fourteen-page statement, the trial court appointed counsel to represent him. The trial, which began on February 15, 1954, and lasted for fifteen days, resulted in a verdict of guilty of murder in the first degree with no recommendation of mercy. A judgment of conviction was entered upon the verdict, and petitioner was sentenced to death.

The questions we are asked to consider are: whether petitioner was denied trial by jury in violation of constitutional rights; whether the confession used by the state as evidence was lawfully procured; whether the refusal to allow petitioner to inspect a confession prior to trial was a denial of due process; whether the tactics of the state so impregnated the jury with the thought that the defense was unfair that the petitioner was deprived of a fair trial; and whether petitioner's right of cross examination was unconstitutionally impaired.

First, we will consider whether the state unconstitutionally deprived petitioner of trial by jury by removing the question of the voluntariness of petitioner's confession [2] from the jury's consideration. A very material element in the evidence which led to petitioner's conviction was his written confession. Before the confession was introduced in evidence at the trial, the question of its voluntariness was determined by the trial judge who resolved the conflicting testimony on the issue in favor of the state. Under New Jersey law, the trial judge's ruling was final for all purposes, and was not subject to scrutiny by the jury when it received the case. The jury was told that the petitioner had voluntarily made the confession and was instructed that it was to determine only whether or not the confession was true and the weight it should receive. On the petitioner's appeal to the New Jersey Supreme Court, these instructions to the jury were affirmed. State v. Tune, 1954, 17 N.J. 100, 110 A.2d 99.

Although, in a constitutional context, the ultimate determination of the issue of voluntariness is not really a question of fact, nonetheless before the determination can be made, basic facts must be accepted as true either because they are undisputed or because they result from the reasonable resolution of conflicting testimony. Lyons v. State of Oklahoma, 1944, 322 U.S. 596, 602, 603, 64 S.Ct. 1208, 88 L.Ed. 1481; Watts v. State of Indiana, 1949, 338 U.S. 49, 51–

---

1. State v. Tune, 1953, 13 N.J. 203, 98 A.2d 881; State v. Tune, 1954, 17 N.J. 100, 110 A.2d 99; Tune v. State of New Jersey, 1955, 349 U.S. 907, 75 S.Ct. 584, 99 L.Ed. 1243.

2. Throughout this opinion the word "confession" is used to refer to a fourteen-page statement, admittedly signed by the petitioner, which contained incriminatory admissions of fact and a confession of guilt.

52, 69 S.Ct. 1347, 93 L.Ed. 1801. The trial judge in the case before us had to resolve conflicting testimony as to what occurred prior to and during the taking of the confession before deciding whether the confession was voluntary. It is, therefore, clear that the trial judge and not the jury decided certain questions of fact in the petitioner's trial.

The question which has been raised is whether the petitioner was constitutionally entitled to have all fact questions ultimately determined by the jury.

■ Although to our knowledge a situation similar to that which confronts us has never been presented to the Supreme Court of the United States, yet what that court has said makes it clear that trial by jury is not a due process requirement. In Snyder v. Commonwealth of Massachusetts, 1934, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674, the Supreme Court said:

"The commonwealth of Massachusetts is free to regulate the procedure of its courts in accordance with its own conception of policy and fairness unless in so doing it offends some principle of justice so rooted in the tradition and conscience of our people as to be ranked as fundamental. Twining v. [State of] New Jersey, 211 U.S. 78, 106, 111, 112, 29 S.Ct. 14, 53 L.Ed. 97; Rogers v. Peck, 199 U.S. 425, 434, 26 S.Ct. 87, 50 L.Ed. 256; Maxwell v. Dow, 176 U.S. 581, 604, 20 S.Ct. 494, 44 L.Ed. 597; Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232; Frank v. Mangum, 237 U.S. 309, 326, 35 S.Ct. 582, 59 L.Ed. 969; Powell v. [State of] Alabama, 287 U.S. 45, 67, 53 S.Ct. 55, 77 L.Ed. 158. Its procedure does not run afoul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser or to give a surer promise of protection to the prisoner at the bar. Consistently with that amendment, trial by jury may be abolished. Walker v.

Sauvinet, 92 U.S. 90, 23 L.Ed. 678, Maxwell v. Dow, supra; New York Central R. Co. v. White, 243 U.S. 188, 208, 37 S.Ct. 247, 61 L.Ed. 667; Wagner Electric Mfg. Co. v. Lyndon, 262 U.S. 226, 232, 43 S.Ct. 589, 67 L.Ed. 961. Indictments by a grand jury may give way to informations by a public officer. Hurtado v. [People of State of] California, supra; Gaines v. [State of] Washington, 277 U.S. 81, 86, 48 S.Ct. 468, 72 L.Ed. 793. The privilege against self-incrimination may be withdrawn and the accused put upon the stand as a witness for the state. Twining v. [State of] New Jersey, supra. What may not be taken away is notice of the charge and an adequate opportunity to be heard in defense of it. Twining v. [State of] New Jersey, supra; Powell v. [State of] Alabama, supra, pages 68, 71 of 287 U.S., 53 S.Ct. 55; Holmes v. Conway, 241 U.S. 624, 36 S.Ct. 681, 60 L.Ed. 1211. Cf. Blackmer v. United States, 284 U.S. 421, 440, 52 S.Ct. 252, 76 L.Ed. 375."

■ In the light of the above, we cannot see how New Jersey has "run afoul" of the Fourteenth Amendment by permitting the trial judge to conclusively determine the voluntariness issue. See also Stein v. People of State of New York, 1953, 346 U.S. 156, 179, 73 S.Ct. 1077, 97 L.Ed. 1522.

■ Petitioner next contends that the confession was not voluntarily given and asks this court to so hold. We may properly upset a determination of voluntariness by a trial judge or jury only if the facts which are unquestioned in the state's version of the case persuade us that the confession was not voluntary. See Watts v. State of Indiana, 338 U.S. at page 52, 69 S.Ct. 1347, 93 L.Ed. 1801.

The facts in this case, which a reading of the transcript indicates were not questioned by either side, are:

William Prather was found dead in the cellar of his home in Irvington, New

Jersey, during the early morning of Saturday, August 23, 1952. When found, Prather was lying on the floor nude from the waist down. In the afternoon of the same day, petitioner was picked up without a warrant and taken to the Newark Police Headquarters[3] and told that he was wanted for questioning about an auto accident. At the Newark station, petitioner stripped from the waist up, removing his coat, shirt, and belt. He was questioned for a short while, fingerprinted, and put into line-ups for identification by witnesses. Petitioner was at the Newark station until about eight o'clock that evening. Petitioner's wife, who was five months pregnant, was also at the Newark station for several hours when petitioner was there. From the Newark station, petitioner was taken to the cellar of the Prather home. In the cellar, certain pictures were taken of petitioner in various poses. In some of the pictures a police officer took the part of the deceased Prather. Petitioner was taken from the Prather home to the Irvington police headquarters, arriving there about 10 p. m. Sometime around midnight a doctor came in to see petitioner and asked certain questions and requested petitioner to perform certain coordination and sobriety tests. After the doctor left, petitioner was questioned for a period of from three to four hours. As he answered questions, a police officer was writing something down. After the questioning, petitioner affixed his signature to the fourteen-page statement which had been written out by the police officer during the questioning. Petitioner's wife was at the Irvington station that night. The afternoon of Sunday, August 24, petitioner had a visitor who turned out to be one Hope, an individual not connected with the police, who was brought in as an impartial witness to examine petitioner about the voluntariness of the confession.

The state's version of the facts was:

Petitioner was taken into custody about 4 p. m. At the Newark police headquarters he was asked to remove his coat, shirt, and belt, this being a standard procedure in homicide cases. Very shortly thereafter, petitioner admitted killing Prather. He was then fingerprinted and put into line-ups and identified by certain witnesses. He talked with his wife and uncle. About 8 p. m., petitioner was taken to the Prather cellar and demonstrated how he had killed Prather. Petitioner was then taken to the Irvington police headquarters, where he ate a meal of his own selection and after it was finished said he felt good and that the dinner was good. Again petitioner repeated orally the details of the crime and displayed a willingness to have his oral statements reduced to writing. A doctor examined petitioner for the purpose of determining petitioner's sobriety, orientation, coordination, and generally his mental faculties. Petitioner then willingly answered questions about the events and his activities in connection with the crime and gave details about his past life. Upon completion of the written confession, petitioner read it aloud. The confession was then read aloud to him, and petitioner admitted that its contents were true and signed each page of the confession and swore to the truth of its contents. At no time was petitioner threatened or coerced in any way. Petitioner's wife was permitted at both the Newark and Irvington stations because she wanted to be there. About 3 p. m. on August 24, 1952, petitioner was interviewed alone by William T. Hope, an impartial citizen-witness, for about ten or twelve minutes concerning the treatment received prior to and during the taking of the confession. Petitioner told Hope that he gave the confession, that he had not been threatened or coerced in any way, that he had read the confession and that it was read to him. Pe-

---

**3.** Irvington and Newark are contiguous municipalities. Apparently, the police departments worked together in this case.

titioner again read the confession aloud in Hope's presence and said that he wished to change nothing.

The version of the facts presented by the defense was in sharp conflict with the state's version and showed the following:

Petitioner was drunk at the time he was taken into custody. It was claimed, though vaguely, that this occurred around noon. At the Newark station, petitioner was ordered to take off his shirt, coat, and belt. He was then questioned and beaten with a hose and with fists and kneed in the stomach. One officer had a blackjack in his hand and told him that he better tell all. Petitioner saw his wife and uncle in the presence of a police officer and so said nothing about the violence although he was crying at the time. He was taken to the Prather cellar and did not re-enact any crime but only followed police directions after he was hit again. When he was taken to Irvington police headquarters, he was offered food but refused. He answered all sorts of questions at the Irvington police headquarters about himself and his activities but at no time admitted Prather's murder, although he admitted having been with Prather and at his home. When he was asked to sign the statement, he refused at first but acquiesced when the police threatened to put his wife (who was pregnant at that time) in jail and brought her to the doorway of the room in which he was sitting. His wife was kept in a locked cell at Irvington police headquarters. Petitioner denied that he had ever read the fourteen-page statement or that it had ever been read to him at the time he signed it or thereafter. Petitioner admitted the circumstances of the doctor's visit but denied the circumstances of Hope's visit. Hope visited him but was only with him a few moments in the presence of police officers and did nothing more than ask him to sign his name on a piece of paper.

■ Our first consideration is whether the facts which were not disputed are sufficiently persuasive to warrant a conclusion that the petitioner's confession was involuntary. We do not think so. The unquestioned facts alone do not show that any force, threats, promises, or violence were used in obtaining the confession; the time element between arrest and the signing of the confession is a period of between twelve and sixteen hours. Within that period, petitioner was fingerprinted, put in several line-ups and taken to the Prather cellar. No long periods of interrogation took place. The situations in cases where the confessions have been determined involuntary have been far more serious. Compare Watts v. State of Indiana, 1949, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801; Turner v. Commonwealth of Pennsylvania, 1949, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810; Harris v. State of South Carolina, 1949, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815; Ashcraft v. State of Tennessee, 1944, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; Chambers v. State of Florida, 1940, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716.

■ A reading of the differing versions of what occurred aside from the accepted facts makes it clear that had the trial judge accepted the defense's version of the disputed events, involuntariness would have been clear and certain. But the trial judge rejected the defense's version and accepted the state's version, which clearly provided sufficient foundation for his conclusion that the confession was voluntary. His resolution of the conflicting testimony cannot now be reviewed. See Watts v. State of Indiana, 338 U.S. at page 52, 69 S.Ct. 1347. Thus, we must reject the petitioner's claim that the confession was involuntary.

Petitioner also contends that the refusal of the state to allow his counsel to inspect his confession prior to trial was a denial of due process.

Counsel was appointed about two months after petitioner had signed the confession. Petitioner admitted to counsel that he had signed a statement but

denied that he had killed Prather, or that he ever told the police that he had. He said that he had never read the signed statement and did not know its contents.

Confronted with this situation, defense counsel prior to trial sought permission from the trial court to inspect the alleged confession,[4] claiming that "The information sought by the attorneys for the defendant is necessary for the proper preparation of the defense, the preparation for trial, and the presentation of the defense at the trial * * *. [A] denial of the right of inspection * * * will result in an injustice or undue hardship to the defendant. * * *"

The trial court granted permission for inspection, but its order was reversed by the Supreme Court of New Jersey,[5] which said that the affidavit accompanying petitioner's application for inspection was insufficient to support the application.[6] After the New Jersey Supreme Court decision, petitioner again applied for permission to inspect. Petitioner's own affidavit was submitted, denying, inter alia, that he had read the statement, or that it was read to him, or that he had admitted the crime, and relating circumstances of force and coercion under which the alleged confession was obtained. Petitioner's counsel also submitted an affidavit, stating, inter alia, that they had good reason to believe (not from petitioner, but primarily because of pictures shown to them in an interview with the prosecutor and "talk around the courthouse") that the alleged confession contained statements concerning sodomy or some other homosexual act, and if this was true it could affect the preparation for the defense and psy-

chiatric help would be needed. Their affidavit also stated that their

"* * * investigation thus far has disclosed material discrepancies between the facts as we have been able to ascertain them (not only from the accused but others) and the theory of the homicide indicated by the State, and to ascertain the real truth of the matter and to prevent an injustice from being done it is, in our opinion, of the utmost importance in the interest of justice that we be permitted to examine and make a copy of the alleged confession.

"The accused has informed us of the information which he gave to the police and in which he informed us he detailed everything which he did from the time he first met William Prather, the deceased [sic], until the time of his arrest, but he has informed us that he has no knowledge whatsoever of what is contained in the alleged confession which he signed or how William Prather was killed or that he had anything to do with any such killing. Under the circumstances of this case as the same have been revealed to us by the accused, as well as others whom we have interviewed, it is our opinion that we cannot properly, fully and squarely present our defense to this indictment unless we are permitted to inspect the confession claimed by the State to have been voluntarily signed by the accused * * *."

Petitioner's second application for inspection was also denied. Thus, petitioner's counsel proceeded to trial without having had an opportunity to inspect the alleged confession.

---

4. In New Jersey, permission to inspect an alleged confession prior to trial is within the discretion of the trial judge.

5. State v. Tune, 1953, 13 N.J. 203, 98 A.2d 881.

6. While four members of the New Jersey Supreme Court joined in the majority opinion denying inspection, three members registered very strong disagreement in a dissenting opinion by Justice Brennan. See State v. Tune, 1953, 13 N.J. 227, 98 A.2d 894.

During the trial, the state continued to resist petitioner's request to inspect. At one point in the trial, when petitioner's counsel Danzig referred to Exhibit S–39 for Identification (the alleged confession), the following colloquy occurred between Danzig and prosecutor Giuliano:

"Mr. Danzig: Would you please hold it up, Mr. Giuliano? I am not supposed to see this.

"Mr. Giuliano: I am not going to be technical about it. You may see it.

"Mr. Danzig: This is the first time in two years that we have seen it.

"Mr. Giuliano: There is no objection at all to your seeing it. I didn't want you to read it.

"Mr. Danzig: This is it, gentlemen of the jury. I have not read it yet.

"Mr. Giuliano: And I will see to it that you don't until the proper time."

When the presentation of the evidence on voluntariness was over, the trial judge ruled that the confession had been voluntarily made by the petitioner. At the time this ruling was made, the trial judge himself had not yet studied the confession or a copy thereof.[7]

It was after the ruling had been made that the "proper time," referred to by the prosecutor, arrived. Then, for the first time, petitioner was given a copy of the confession.

Three days later the trial concluded and the case was submitted to the jury.

Although the confession was not given to the defense, the state's reply affidavits, submitted when the second application for inspection was made, did say that it was the state's position "* * * that the commission of both sodomy and robbery played an important part in the commission of murder. * * *" The trial judge also authorized defense counsel to retain a psychiatrist to examine the defendant, which was done. Petitioner denied to the psychiatrist that he had committed sodomy or any other homosexual act.

■■ The argument on this point is that even though the defense was apprised by the state that sodomy and robbery were involved and psychiatric assistance was authorized and obtained, nonetheless "Had the psychiatrist, during this pre-trial examination of the defendant, been able to confront the defendant with his confession or had he been armed with the details pertaining to the commission of sodomy, he might have pierced the iron curtain, impervious to communication, that the defendant had drawn between himself and that transaction and obtained sufficient data to evaluate the impulses and compulsions motivating the defendant under the circumstances and the jury would have had the benefit of such scientific opinion and give it whatever weight it might think it was entitled to."[8] Summed up, the claim is that the psychiatrist, if he had had a copy of the confession, could have examined the petitioner more effectively. Without the confession, according to defense counsel, they were hampered in preparing a complete defense, and thus petitioner was deprived of due process. We cannot agree. While refusal to give the defense a copy of the confession may not be the better practice,[9] failure to do so will violate due process only if prejudice can be shown. See Leland v. State of Oregon, 1952, 343

---

7. Apparently the trial judge was given a copy of the confession just prior to a discussion as to its admissibility. He did note that it was signed by the petitioner. But after the discussion, he explained to the jury that he and counsel for the defendant had been supplied with typewritten copies, and that *although the confession had been admitted into evidence,* it would not be read to the jury until the following day so that the defense could read it over and "that will also give me an opportunity to study it tonight."

8. Defendant's brief, pp. 26–27.

9. It has been held in Louisiana that refusal to give the defense a copy of a confession per se is a violation of due process. State v. Dorsey, 1945, 207 La. 928, 22 So.2d 273.

U.S. 790, 801–802, 72 S.Ct. 1002, 96 L. Ed. 1302. Since the state did specifically inform the defense that sodomy and robbery were connected with the case, and since the state did afford psychiatric assistance, no harm occurred so far as due process is concerned. We have only the petitioner's assertion that the course of the defense might have been different. There is nothing else in the record to support the assertion. Indeed, psychiatric opinion might well vary as to how much effectiveness was lost in examining the petitioner without a copy of the confession. Also, we note that defense counsel made no attempt after receiving the confession to do what it now claims it might have done. True, the trial concluded three days after the defense was given the confession, but there is no indication that a psychiatric examination could not have been arranged without significant delay in the trial.

There is, however, another distinct problem that arises because of the state's refusal to produce the confession prior to trial. As we have pointed out earlier, New Jersey, unlike some other states,[10] does not allow the jury to determine ultimately the question of voluntariness. The jury is compelled to accept the confession as voluntary and is so charged, as was the jury in this case.

Thus, it is readily apparent that any basis which the petitioner had for challenging the admission and use of the confession in the trial, so far as voluntariness was concerned, had to be addressed to the trial judge.

Petitioner did so present evidence to the trial judge to sustain the contention that the confession was involuntary and should therefore be excluded from the case.

The defense centered around factors which frequently are important on the issue of a defendant's voluntariness in giving or signing a confession. These factors will vary from case to case and may include defendant's mental or physi-

cal state, the circumstances of his arrest, the period of time during which he is held incommunicado, the treatment he received during that period, including the method or methods of police or other official interrogation, etc. But aside from the combination of circumstances which culminate in the obtaining of an alleged confession, there is another important factor which concerns the alleged confession itself that is necessarily important and relevant in considering whether an alleged confession was voluntary. And that factor is the accuracy or inaccuracy of the statements contained in the confession. Certainly, important shadows of doubt might be cast upon the alleged voluntariness of a confession if it were shown that statements in the confession were false. The entire confession, of course, may not be false, but if some significant portion of it should be, that fact would add weight to the side of the scale marked "involuntary." We think that the truth or accuracy of statements contained in an alleged confession is significantly relevant to the question of voluntariness.

In some states under the practice which permits the jury to ultimately decide the issue of voluntariness, the defense, when it receives the confession after its admission in evidence, has an opportunity to challenge its accuracy before the jury determines finally whether it is a voluntary confession. However, under New Jersey law, the defense did not have the opportunity to challenge the accuracy of the statements contained in the confession as a factor to be considered on the issue of voluntariness, and understandably so, because petitioner did not have a copy of the fourteen-page confession in his hands until *after* the ruling on voluntariness had been finally made, which ruling governed for all purposes and was not to be questioned later by the jury.[11]

■ What we have said readily points up that the refusal of the state to allow

---

10. See 85 A.L.R. 870 et seq.

11. It is true that the jury was told that it was to determine the truth of the con-

fession, but this is beside the point since the accuracy of the confession was important in the voluntariness issue, which

petitioner to inspect the confession prior to the final ruling on voluntariness effectively deprived petitioner of an opportunity to inject the factor of the confession's accuracy and truth into the trial on the issue of voluntariness. That factor might very well make a difference in a trial judge's determination of that issue. And a different ruling on voluntariness would have been most significant since the trial judge was of the opinion that without defendant's written and oral statements there could be no conviction and so charged the jury.

In this case, however, we find no resulting prejudice to the petitioner. He did not deny the truth of many of the facts contained in the confession. Other such facts, although denied by petitioner were substantially corroborated by state witnesses. The petitioner, of course, denied the facts immediately concerned with the killing, but it does not appear that the defense could have challenged those facts by evidence other than the petitioner's denial. There is no indication that the petitioner would have been able to challenge the facts contained in the confession even had he been given a copy of the confession prior to trial and thus had more time for investigation and preparation.[12]

Other contentions made by petitioner, including the alleged unfair tactics of the state during the trial and the alleged deprivation of the right to cross examine witnesses, have been examined but contain no substance and do not require discussion.

The order of the district court will be affirmed.

HASTIE, Circuit Judge (concurring).

As I read the record, defendant did not contend before trial or at trial that the very contents of the alleged signed

confession would or might shed light on the question whether he had been coerced. At the trial, throughout the preliminary inquiry by the court to determine the admissibility of the document, the defendant maintained that nothing of its contents should be revealed. And even on this appeal the defendant does not indicate how pretrial disclosure might have helped him establish that he had been coerced. In the absence of any such showing it seems to me that the conclusion of the court cannot properly be avoided. But I think Judge STALEY has very correctly pointed out that, in other circumstances, a grave due process question may arise out of the very unsatisfactory practice of deciding upon the admissibility of an alleged confession without first revealing its contents to the defendant and affording him a reasonable opportunity to use the text itself in support of his claim of coercion.

---

had already been conclusively determined when the jury received the case. In addition, charging the jury that the confession was voluntary certainly was persuasive as to the confession's accuracy and truth. A voluntary confession is less likely to be inaccurate and false than an involuntary one.

12. Of course, had the state provided the petitioner with counsel at the time of his arrest or prior to his signing of the statement, the question of prejudice would not have arisen. Compare Reece v. State of Georgia, 1955, 350 U.S. 85, 76 S.Ct. 167.