Elmer DAVIS, Jr., Appellant,

v.

STATE OF NORTH CAROLINA,
Appellee.

No. 8453.

United States Court of Appeals
Fourth Circuit.

Reargued June 7, 1962.

Decided Nov. 7, 1962.

Haynsworth, Circuit Judge, dissented.

W. B. Nivens and Charles V. Bell, Charlotte, N. C., for appellant.

Harry W. McGalliard, Asst. Atty. Gen. of North Carolina (T. W. Bruton, Atty. Gen. of North Carolina, on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.

SOBELOFF, Chief Judge.

No task is more unwelcome to a federal court than that of determining whether a constitutional infirmity exists in a particular state criminal proceeding. However, when an issue of federal law is raised in a state trial, it may later become our duty to undertake such a review. The question in the present case is whether the District Court erred in dismissing a petition for a writ of habeas corpus filed by a state prisoner without conducting a hearing.

On December 18, 1959, the Superior Court of Mecklenburg County, North Carolina, sentenced Elmer Davis, Jr., to death in the gas chamber for the rape-murder of Mrs. Foy Bell Cooper. The Supreme Court of North Carolina affirmed. State v. Davis, 253 N.C. 86, 116 S.E.2d 365 (1960). Certiorari was denied by the Supreme Court of the United States, 365 U.S. 855, 81 S.Ct. 816, 5

L.Ed.2d 819 (1961). The present proceedings were then begun by the filing of a petition for a writ of habeas corpus under 28 U.S.C.A. § 2241 in the United States District Court for the Eastern District of North Carolina. After the petition was denied without a hearing, an appeal in forma pauperis was permitted and a certificate of probable cause was issued by the District Court.

The gist of the petitioner's complaint is that an illegally obtained confession was utilized by the State at his trial.[1] Confining ourselves at this point to the undisputed evidence in the State record, the following appears:

Between 2:00 and 3:00 p. m., Sunday afternoon, September 20, 1959, Foy Bell Cooper, an elderly woman, left her home for a visit to her mother's grave two blocks away in the Elmwood Cemetery, Charlotte, North Carolina. About 4:30 that afternoon her lifeless body was discovered by a group of young boys playing at the cemetery. An autopsy disclosed that death had been by strangulation; also, that the victim may have been raped. A few hours later Elmer Davis, an escaped convict under sentence of seventeen to twenty-five years for robbery and assault with intent to rape, was arrested by the local authorities of Belmont, North Carolina, about twelve miles from Charlotte. The following day, Davis was taken to Charlotte and placed in the City Jail, customarily used for overnight detention only. A specific notation was made on the arrest sheet: "Do not allow anyone to see Davis, or allow him to us (sic) telephone." During the next sixteen days, Davis was questioned by an undetermined number of officers, (twenty-nine had been assigned to the Cooper case), about the murder and about other felonies thought possibly to have been committed by him since his escape. The primary purpose was to check out and break down, if possible, any alibi Davis might have for the afternoon of September 20.

Then on October 6 Davis was taken to police headquarters. What occurred there is in dispute. The police version is that after Davis and a police officer "prayed together,"[2] he signed a paper confessing the rape and murder of Mrs. Cooper, and that he then took the officers to the cemetery and re-enacted the crime. In any event, on returning to headquarters from the cemetery Davis was formally charged with the offense and bound over. Later, in a conversation with his church pastor, Davis stated that he had been properly fed and well taken care of during his confinement. It is undisputed on the record, however, that Davis was fed two sandwiches twice a day—he says sometimes one—and was permitted to bathe once during that time.

At trial, Davis' counsel objected to the introduction of the confession into evidence. In accordance with the State practice, the trial judge excused the jury and took testimony on the voluntariness of the confession. See State v. Rogers, 233 N.C. 390, 64 S.E.2d 572, 28 A.L.R. 2d 1104 (1951). According to the transcript, which recites the testimony, not verbatim, but in narrative form, Davis denied making any admission of guilt to the officers or re-enacting the crime for them. He said he was told, "Davis, go

1. Appellant briefed and argued a second point. It is that the trial court erroneously declined to instruct the jury that in order to find the accused guilty they must be satisfied beyond a reasonable doubt that the murder was committed in the perpetration of rape. It appears, however, that the trial court did charge the jury, "If you are satisfied from this evidence and beyond a reasonable doubt that the defendant on September 20, 1959, while perpetrating the crime of rape, as that term has been defined to you, upon one Mrs. Foy Bell Cooper, the defendant caused her death, then it would be your duty to return a verdict of guilty." The difference between the instruction requested and that given is not constitutionally significant, and this point will not be further considered. Grundler v. North Carolina, 283 F.2d 798 (4th Cir. 1960).

2. For a revealing discussion of the dubious use of religious leverage to induce confessions see, Kruse, The Role of the Clergyman in the Coerced Confession, Washburn L.J., Winter, 1961.

in there and sign that paper so you can go to the county jail and get something to eat and get a hot bath," and that when he signed he "did not think [he] was confessing to any crime." He contended that he is illiterate and the whole document was not read to him before he signed it. He testified that he did sign some paper, which was read to him, after a police officer told him, "I determined to fram the hell out of you if you don't tell me something," and that he was in fear for his life. He insisted, however, that what was read to him was not represented to relate to any murder. Later, to substantiate this claim, it was pointed out on behalf of Davis that his signature was affixed only to the second page of the two page confession, and that this page contained no mention of the rape-murder.

As to the treatment he received while at the City Jail Davis testified: "I told them I would like to get something to eat, and call my sister so she could bring me something to eat, and they put me way upstairs in a room off by myself where nobody could come up there and see me. * * * During the course of these three weeks, two more detectives talked to me. They would talk to me sometimes twice a day [about the murder]. * * * [T]hey talked to me every day from the time I got there until I signed this paper." Davis also testified that he lost 15 pounds on the food provided him at the jail. Also, he asserted that the police did not inform him of his constitutional rights.

In rebuttal, police officers asserted that the whole confession had been read to Davis, and that no one told Davis he would "fram" him if he did not sign. Also, State's witnesses offered to refute the arrest sheet directive to hold the prisoner incommunicado. One related that Davis had asked to see his sister, and that he (the witness) had tracked her down and conveyed the message. The witness did not recall, however, whether she actually visited the prisoner before he confessed. Four officers admitted interrogating him several times between September 21 and October 2. They did not specify the length and manner of the questioning. The officers did not dispute the entry on the arrest sheet that Davis was being held as a suspect in the Cooper case, but they denied asking him questions about the murder at any time between September 21 and October 2. In addition, they stated that no other person had ever been kept for as long as sixteen days in their overnight jail which lacked kitchen and other facilities usually considered necessary for long detentions. No explanation was offered for confining him there instead of the regular jail located just across the street, which is customarily used when an arrested person is to be held more than a few hours.

At the close of the testimony, the trial judge ruled: "Let the record show that the Court at this time rules that the statement made by the defendant to Lieutenant C. L. Sykes in the City of Charlotte police department, was made voluntarily and such statement is admitted in evidence, as shown by the written record." The judge made no other findings of fact.

In affirming the trial court's ruling, the Supreme Court of North Carolina said: "According to our practice the question whether a confession is voluntary is determined in a preliminary inquiry before the trial judge. He hears the evidence, observes the demeanor of the witnesses, and resolves the question. The appellate court must accept the determination if it is supported by competent evidence." 116 S.E.2d at 370. To show such support, the court recited: "The officers testified the prisoner had not been mistreated in any way; that he had the same food as other prisoners [in the overnight jail]; that he did not ask to see or communicate with any person except his sister. This request was granted. On the day after the confession the prisoner told Dr. Tross, his former pastor—a member of his own race—that he had been well treated by the officers." 116 S.E.2d 370. The appellate court did not undertake to make

independent findings of basic facts, but pointed to evidence that would support findings by the trial judge.

■ The question in the present case is whether the above furnishes a sufficient basis upon which the District Court could decide without a hearing whether the confession in question was obtained within the bounds of due process. This appeal brings us to the inquiry, in what circumstances may federal district courts rely upon the State record and adjudicate the constitutional claim presented without conducting a hearing.[3]

The guideline is laid down by the Court in Brown v. Allen, 344 U.S. 443, 463, 73 S.Ct. 397, 97 L.Ed. 469 (1953), where it is said that the writ may be refused without a hearing only " * * * if the court is satisfied, by the record, that the state process has given fair consideration to the issues and the offered evidence, and has resulted in a satisfactory conclusion." Mr. Justice Frankfurter, in his concurring opinion, amplified this portion of the majority opinion. According to his exposition, concurred in by a majority of the justices,[4] if the State court has held a hearing and rendered a decision based upon "specific findings of fact" the federal judge need not rehear the facts. 344 U.S. at 504, 73 S.Ct. at 444. But, " * * * if the record * * * is found inadequate to show how the State court decided the relevant historical facts, the District Court shall use appropriate procedures, including a hearing if necessary, to decide the issue." 344 U.S. at 503, 73 S.Ct. at 444. We take this to mean that the federal judge may rely upon the state record where the historical facts are not in dispute, or, if there is a dispute, where the State court has resolved the factual conflict.

The question is not a new one in the Fourth Circuit. A case directly in point

is Holly v. Smyth, 280 F.2d 536 (4th Cir.1960), where there had been a hearing in the State court, but the conflicting historical facts had not been resolved. We determined, in accordance with Brown v. Allen, that it was error for the District Court to deny a hearing since the unadjudicated factual allegations raised a substantial constitutional issue. We stated: "[I]f the State Court record and findings disclosed that there has been a fair and satisfactory consideration of the facts, the federal court need not have a rehearing on the same facts. The record here is totally deficient in this respect; we are not told what evidence was considered or what factual findings were made. Hence the District Court could not evaluate the State Court's factual conclusions or treat them as a discretionary ground for denying the petitioner a hearing." 280 F.2d at 543.

Likewise, in Grundler v. North Carolina, 283 F.2d 798 (4th Cir.1960), consistent with Brown v. Allen, we said that the District Court must conduct a hearing to resolve conflicts in the historical facts unless there was a "plain showing that there had been a full, fair and satisfactory adjudication of the issue in the state court." 283 F.2d at 802. In that case, however, there was no significant issue of fact bearing upon the constitutional claim. We pointed this out in upholding the denial of a plenary hearing.

To the same effect are our holdings in Clark v. Warden, 293 F.2d 479, 481 (4th Cir.1961); Player v. Steiner, 292 F.2d 1, 2 (4th Cir.1961); Bolling v. Smyth, 281 F.2d 192 (4th Cir.1960). Accord: United States ex rel. Sileo v. Martin, 269 F.2d 586, 591 (2d Cir. 1959), where the court said, "Faced with such a situation, [where the factual basis of a trier's decision is obscure], the federal district court need not speculate

---

**3.** The State does not contend, nor could it, that the District Court is not required to make an independent legal conclusion of the constitutional claim present. See, e. g., Reck v. Pate, 367 U.S. 433, 435, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961).

**4.** Justices Black, Douglas, Clark and Burton joined in this portion of Justice Frankfurter's opinion.

as to the basis of decision in the state courts, but should itself proceed to a determination of the facts so that the federal question may be resolved."

The practice of appellate courts in confession cases is to consider only the undisputed facts and the facts in favor of the state in determining the issue of voluntariness, where no specific findings have been made by the trier. See, e. g. Culombe v. Connecticut, 367 U.S. 568, 604, 81 S.Ct. 1860, 6 L.Ed. 1037 (1961). However, this is because appellate courts, unlike the district courts, have no facilities for conducting factual inquiries, and we do not think that this practice must be adhered to by the district courts. Thomas v. Arizona, 356 U.S. 390, 402–403, 78 S.Ct. 885, 2 L.Ed.2d 863 (1958), does not hold otherwise. There the Court merely restated the usual appellate practice above outlined. True, in that case an issue of fact had been left unresolved by the state's determination of voluntariness, and the Court did deem it not an abuse of discretion for the District Court not to hold a hearing to adjudicate the issue, but this conclusion was reached apparently because the issue of fact was not a particularly significant one under the circumstances.

■ In the present case, the unresolved issues of fact raise a substantial challenge to the validity of the confession. To summarize, Davis alleges that he was held incommunicado, isolated from counsel, friend or family, in a small room at the City Jail for sixteen days;[5] that he was questioned daily, sometimes twice a day;[6] that he was inadequately fed;[7] and that he was not informed of his con-

stitutional rights.[8] While no mention is made of police brutality, we have been told that "the blood of the accused is not the only hallmark of an unconstitutional inquisition." Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed. 2d 242 (1961). The question to be determined is whether Davis' will was overborne to obtain the confession. See Reck v. Pate, 367 U.S. 433, 440, 81 S.Ct. 1541, 6 L.Ed.2d 1641 (1961). And its probable truth can shed no light on this issue. See Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

The State argues that, as Davis was under sentence, his detention was not illegal. The point made on behalf of the prisoner, however, is not the illegality of the detention per se, and at all events we would not concern ourselves with this feature in a state case. Compare McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). Davis' contention is that had he been kept in a regular jail, given normal food rations, permitted customary access of relatives, friends and counsel, the fact that he was under sentence might have been sufficient basis for the State's argument to overcome any adverse inference. He makes allegations here of the presence of factors, unusual if not unprecedented in dealing with sentenced prisoners, which tend to offset the explanation offered.

We do not express any opinion as to the ultimate resolution to be made of the petitioner's claim; however, we think that he has alleged enough to entitle him to a hearing. The District Court should reach its conclusions only after consider-

---

**5.** The undisputed length of detention exceeds that in Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949) (four nights and five days); or Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957) (five nights and five days); or Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (three nights and four days); or Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (four nights and five days).

**6.** Protracted interrogation has been a basis of decision in numerous Supreme Court cases. See, e. g., Turner v. Pennsylvania, supra, note 5.

**7.** Inadequate feeding of a prisoner was a basis of decision in Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). See also, Reck v. Pate, supra, note 5.

**8.** See, e. g., Gallegos v. Colorado, 370 U.S. 139, 82 S.Ct. 1209, 8 L.Ed.2d 384 (1962).

ing the evidence offered at the hearing as well as the State record.

Reversed and remanded.

HAYNSWORTH, Circuit Judge (dissenting).

We move in a delicate area involving the relations between state and federal courts. Immediately involved is the respect which should be accorded and the finality which may be attributed to the finding of the state courts that a confession received in evidence in the state trial court was voluntary. The importance of the resolution of the question to the administration of justice in dual judicial systems far outweighs the effect of the decision upon this state prisoner. Because it is important and because the majority opinion seems to me to broaden unduly the habeas corpus jurisdiction, I feel compelled to record my dissent from the views of my brothers.

When this matter came before the District Court, it did not, as it might have done, accept without re-examination the factual determinations of the state courts. It examined and appraised the testimony taken in the week-long murder trial. It concluded, "[a]fter a consideration of the facts in this case," that Davis had not shown the confession to have been involuntary.[1] This court reverses on the ground that a plenary hearing should have been held, and it now orders the District Court to hold such a hearing and to receive and consider any evidence that may be then offered.

This it does despite the fact that Davis sought no such hearing of the District Court. He seeks none now. He stood upon the state court record, which the District Court fully and carefully considered. He stands upon it here. He does not suggest that he wishes to offer, or that he could offer, anything in supplementation of it. He does not contend that the District Court should hear the witnesses who previously testified in the murder trial, as this court now directs.

If the reversal and remand serve any purpose, other than the purpose of delay, it must be understood to command a fully blown trial *de novo* of the crucial and principal factual issue in the state court murder trial. So far as now appears, at that retrial substantially the same testimony will be presented by the same witnesses who testified in the state proceeding.

Whatever its effect, reversal seems to me to run counter to two important principles. The first is that a fair determination in the state courts of a fully litigated factual issue may be accepted as conclusive in the District Court when the same issue is tendered on a petition for a writ of habeas corpus. The second is that, in such a case, if the District Court reconsiders the factual issues and makes independent findings, it usually should limit its consideration to the evidence adduced in the state court if a transcript of that evidence has been filed with it or is readily available.[2]

Admissibility of the Davis confession turned upon factual questions. The facts were sharply in dispute.

Davis testified, in the absence of the jury, that he confessed to nothing. He said he was threatened with a beating. Carried to the cemetery where this brutal[3] rape-murder of an elderly woman occurred, the officers pointed out things to him, but he told them of nothing, for he had not committed the crime. He did admit that he had led the officers to a place nearby where he had hidden his prison shoes after stealing others. Later, he testified, an innocuous statement was read to him and he was told to sign it. He signed it, because he was afraid and

---

1. Davis v. North Carolina, E.D.N.C., 196 F.Supp. 488, 493.

2. Brown v. Allen, 344 U.S. 443, 480, 73 S. Ct. 397, 97 L.Ed. 469; Stickney v. Ellis, 5 Cir., 286 F.2d 755; Wilson v. Sigler, 8 Cir., 285 F.2d 372.

3. The coroner, a pathologist who performed a complete autopsy, was of the opinion that several of her injuries were severe enough to be fatal, but he thought the immediate cause of death was strangulation.

hungry, and because he was promised food and a bath if he did sign the nonincriminating statement. He admitted his signature on the second page of the written confession, but denied that all of that page had been read to him. He did not read it himself, for he could not read.

The testimony of the officers was quite contradictory of Davis. There were no threats. There were no promises. Davis, fully informed of his rights, freely confessed to one of the officers. In the cemetery with several of the officers, he re-enacted the crime and led them to the places where he had concealed his prison shoes and other clothing. Later, he listened attentively and commented frequently as one of the officers dictated a confession. When the stenographer's notes were transcribed, he read the two written pages carefully and signed the second one. While in jail he had been reading a Testament.[4]

Plainly, if Davis truthfully recited the facts, the written confession and evidence of his oral and demonstrative confessions were all inadmissible. They were all admissible if the facts were those to which the officers testified. There lurked there no subtle constitutional question.

There were peripheral matters.

The real contention advanced by Davis here is that his detention anywhere was unlawful, and that his unlawful detention requires a holding that the confession was involuntary. Though an escaped prisoner from lawful detention upon a conviction for assault with intent to commit rape, he could not be detained after his arrest, he says, unless promptly served with a warrant charging him with the crime of escape or with the murder of Mrs. Cooper. This contention, so patently misconceived,[5] the court does not dignify with discussion.

There is the fact that a notation appears on his arrest record that he was not to be allowed to see anyone or to use the telephone. Most of the officers knew nothing of it. All of them testified such an order was unauthorized and unenforced. The evidence is uncontradicted that Davis asked to see no one except his sister. He expressed a wish to see her on October 1, 1959 after he and several detectives returned to Charlotte from Asheville where they had been attempting to identify buildings which Davis claimed he had burglarized. Davis and one of the detectives could not find the sister's name in the telephone directory, but the next day, four days before the confession, the detective located her residence and delivered the message to her. Because of her children, she said she could not then leave her home but that she would go to see her brother when she could. She did go to see him, and she saw him when she went, though none of the detectives could recall whether this was before or after the confession.

No one else sought to see Davis until after his confession. Those who sought to see him during his detention in Charlotte were not turned away.

There was the matter of food.

There were no kitchen facilities at the Charlotte City Jail. Purchased sandwiches constituted the solid food fare given the prisoners. Twice a day each prisoner was given two sandwiches.[6] The officers testified that usually there were extra sandwiches and some prisoners wished only one, so that, usually, a prisoner who wanted them could have three or even four sandwiches at each meal. According to the officers, on one occasion, Davis asked for hot sandwiches rather than the cold ones offered him. On that occasion, hot hamburger sandwiches and milk were procured and given to him.

---

4. Late in the trial, one of the witnesses commented on the fact that Davis appeared to have been reading a Bible throughout the trial.

5. See United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48.

6. It is true, as the majority observes, that Davis, at one point, said he got only one sandwich at the 6:00 o'clock meal. In the very next breath, however, he said, "Man, I just told you I got two at 6:00 o'clock."

The diet of sandwiches was not uninterrupted during the sixteen-day period. On October 1st and 2nd, there were regular, hot meals, one at the house of one of the detectives and others in Asheville. Moreover, Davis admitted that one of the detectives "brought me peanuts and stuff like that all along" and cigarettes, things which, according to the detective, Davis requested not because of hunger, but simply because he liked them.

There was no evidence of protracted interrogation. There was testimony that the Cooper murder was not mentioned to Davis until October 2nd and, a week-end intervening, was not again mentioned to him until October 6th, when Davis readily confessed. There was testimony that the Cooper case was assigned to the entire detective division consisting of twenty-nine men. Each of the twenty-nine may have had something to do with the case, for there were a number of suspects, but there is no evidence that more than four or five of them ever talked to Davis. Davis testified that one or more of them spoke to him every day. It is not clear that he intended to say that they spoke to him each day about the Cooper case, but there is no suggestion of any grueling or extended session of interrogation.

The officers were questioning Davis daily, or nearly so. At the time of his arrest, he was in civilian clothing and he had in his possession a number of articles which aroused their suspicion. They wished to know where he got those things and where, after his escape, he discarded his prison clothing. Davis told them of thefts and entries he had committed in the vicinity of Asheville, and the officers sought to check those stories.

When they could not confirm them, they took a willing Davis with them to Asheville and nearby places, but Davis was unable to identify the scenes of his crimes.[7]

There is nothing in such investigative procedures suggestive of oppression or illegality. Nor does an otherwise lawful detention become unlawful or coercive when, for the convenience of officers engaged in a current investigation, the prisoner is temporarily held in a jail where he is readily accessible to the officers.

Finally, Davis makes no claim, as such, that he was not informed of his rights. If there is such a claim or "allegation," it is inferred from his testimony that on October 6th he was threatened and induced to sign a paper by a promise of food. The only direct testimony on the point is that of the officers, who said that Davis was fully informed of his constitutional rights. The written confession recites the fact that he was.

From the foregoing it is apparent there was an evidentiary basis for the finding that the confession was voluntary. If there had never been a hearing, doubtless the "allegations"[8] of the petitioner would suffice to require one, but there has been a full hearing, and the evidence supports the finding of the state trial judge, in which the District Judge has now concurred.

When, in the murder trial, Davis objected to the admission of the written confession, the jury was excused. In the absence of the jury, the factual issues, upon which the admissibility question was dependent, were fully developed through the testimony of Davis and several of the officers. On the basis of that testimony, the trial judge ruled that

---

7. Davis did not tell them of the thefts he committed in the vicinity of Elmwood Cemetery in Charlotte, until after his confession when he led them to the places where he had concealed his prison shoes and other clothing. Earlier, he had insisted that all of his petty larcenies had been committed in the mountains near Asheville.

8. In the petition there are no pertinent allegations beyond the conclusionary statement that the confession was involuntary and coerced. By reference, the petition incorporated within it the entire record of the proceedings in the state courts. The "allegations," to which the majority opinion refers, are extracted from the evidence offered in the full evidentiary hearing held in the state court.

the confession was voluntary and admissible.

After the trial judge found the confession voluntary and admissible and the jury's return, a number of witnesses were examined and cross-examined on matters affecting the voluntary nature of the confession. All of the peripheral matters, the duration of the detention in the city jail, the notation on the arrest record, the visit of the sister, the food Davis received and the officers' inquiries of him, were fully developed in testimony taken in the presence of the jury. Davis did not testify in the presence of the jury so that his testimonial version of the events of October 6th, when the confession was executed, was before the jury only inferentially from the negative statements of witnesses who did testify.

On the basis of the evidence before it, the jury's verdict of guilt is a finding of fact that the confession was voluntary. In his instructions to the jury, the trial judge reviewed the defendant's contention that he had not confessed the murder and that if he implicated himself in any way, he did so when he was hungry, when he had been threatened and under other circumstances indicating his conduct was involuntary. The jury was told that reasonable doubt of guilt could be founded upon doubt that the confession was voluntary.

There is not the slightest indication that the trial judge or the jury applied an erroneous legal standard when resolving the essentially factual issue of the voluntary nature of the confession. What the court said in its charge to the jury indicates that both judge and jury applied a proper legal standard. If that portion of the charge might have been elaborated, Davis did not request it and

has never found fault with the charge on that score.

On direct appeal, the North Carolina Supreme Court carefully reviewed the evidence and held it sufficient to support the finding that the confession was voluntary.[9] In performing its appellate function, it was unembarrassed by the absence of detailed and specific findings on subordinate factual questions. It did not remand for more specific findings nor did it order a new trial because of their absence.[10] It affirmed, as we would do on direct appeal if a District Judge, after hearing conflicting evidence, had found generally that the tendered confession was voluntary and admissible.[11]

Though a general finding by a District Judge that a confession was voluntary and admissible would be unassailable in this court on a direct appeal, though the North Carolina Supreme Court has treated it as having resolved the factual controversy, this court now says that such a ruling by a state trial judge is a "fatal flaw"[12] requiring a retrial in the federal courts of the factual controversy it settled.

To me, the doctrine is both novel and alarming. There ought to be a double standard here, for we have no general jurisdiction to review the judgments of state courts. Certainly we ought not to prescribe more stringent rules for state court judges than for federal. If, in similar circumstances, a general finding by a District Judge would be treated as determinative of the facts, surely such a finding by a state trial judge should be so treated by us when the District Court has so treated it and has concurred in it.

The majority recognizes that appellate courts accept a general finding that a confession was voluntary. This is said to

9. State v. Davis, 253 N.C. 86, 116 S.E.2d 365.

10. It was not asked to do so, of course, but neither is this court.

11. Rule 52 of the Federal Rules of Civil Procedure requires specific findings in nonjury civil cases. There is no comparable rule in the Criminal Rules. There is no rule requiring a District Judge in any case to pause and make specific findings of fact when ruling on the admissibility of evidence.

12. Brown v. Allen, 344 U.S. 443, 506, 73 S.Ct. 397, 97 L.Ed. 469.

result from the fact that appellate courts have no facilities for factual inquiries. It is true that we do not possess such facilities, but that is not the reason for the appellate practice. The reason is that the finding of the trial judge is due the respect it receives in this and other appellate courts. If it is not due that respect, if in a nonjury case a District Judge fails to make requisite specific findings, we have the power to remand for additional findings or for a new trial. When the findings are defective, there is an appellate remedy. It is because a general finding that a confession is voluntary and admissible is not defective as a finding that it is accepted in this and other appellate courts as foreclosing all questions except of sufficiency.

We are told that the Supreme Court's denial of the petition for certiorari is without significance to an appraisal of the effect of the earlier proceedings.[13] If the Supreme Court had granted the writ, however, if on direct review of the North Carolina judgment it had fully considered the constitutional claim Davis advances here, surely its considered judgment would have been of significance in the habeas corpus court. There is no doubt that had the Supreme Court granted the writ, it would have considered only the sufficiency of the evidence to support the finding, treating the state court judgment as dispositive of the factual issues.[14] Had the Supreme Court affirmed the North Carolina judgment,[15] would the habeas corpus court be required to disregard the state court judgment as a resolution of the historic facts and retry the confession issue? The majority holds it would, for it says the habeas corpus court may not accept the finding, though the finding is perfectly acceptable in appellate courts on direct review.[16]

For the principles which should govern us here, I turn first to Brown v. Allen, as does the majority. I do so with particular readiness, for the Brown case is precisely like this one. It involved a North Carolina prisoner who claimed a confession had been coerced. When he objected to admission in evidence of the confession, the jury was excused and, in its absence, Brown and two police officers

13. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469.

14. Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265; Gallegos v. Nebraska, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86; Harris v. South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815; Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810; Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801; Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; Lyons v. Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481.

15. The great probability is that it would have affirmed, for the sufficiency question is insubstantial.

16. If the majority be right in their view, what becomes of the doctrine of exhaustion of remedies? Is the state court prisoner seeking a retrial of the confession question before a federal judge to be required to joust with windmills in state appellate courts and in the United States Supreme Court where the only possible issue is the sufficiency of the evidence to support the general finding, an issue quite unlike the factual one he expects to tender in the habeas corpus court? Or must he exhaust state court remedies with respect to his contention that the general finding was not a final determination of the facts? The latter requirement would be as fruitless as the first, for if the question was raised in the state appellate courts and in the United States Supreme Court those courts would clearly find no infirmity in the general finding because of its want of specificity as to subordinate facts. But if the finding is held to be without infirmity when reviewed directly, and the holding is implicit in the treatment of the issue of the sufficiency of the evidence, is the habeas corpus court bound to hold that the finding did not have the effect which all courts on direct review quite correctly held it to have had?

The majority says it is. I think that when a state court's finding is in such form that the United States Supreme Court, on direct review, will accept it as sufficient and as a conclusive determination of the facts, it is no business of ours to say a habeas corpus court errs if it treats the finding as sufficient or if it attributes any significance to it.

testified. Their stories differed. The trial judge then found, generally, that the confession was free and voluntary.[17] Later much of this ground was again explored in the presence of the jury except that Brown did not testify in the jury's presence. The jury found him guilty. Brown exhausted his state remedies and then sought habeas corpus in the District Court. The petition was denied without a hearing. This court affirmed and was affirmed, in turn, by the United States Supreme Court. With proceedings exactly like those in Davis, in a trial court of the same state, exactly the same kind of general finding as to the voluntary nature of the confession was held to make unnecessary a retrial of the factual issue in the habeas corpus court.

The very point upon which we now disagree was expressly considered and determined in Brown v. Allen. Brown contended that the federal habeas corpus court committed error when it refused the writ on the basis of the state court record without taking evidence and retrying the factual disputes underlying the constitutional claims.[18] The contention was rejected. The holding is summarized in the statement, "Since the complete record [of the state court proceedings] was before the District Court, there was no need for rehearing or taking of further evidence."[19] There was no dissent from that conclusion.

If one overlooks the holding of the Court on the point and considers only the concurring opinion of Mr. Justice Frankfurter, in which a majority of the Court concurred, the answer might seem uncertain. But Mr. Justice Frankfurter

was not addressing himself to this point as applied to the particular facts of the Brown case. He was concerned with the suggestion that the habeas corpus jurisdiction should be more limited and its exercise controlled by rigid rules.[20] His opinion is a powerful exposition of the view that the jurisdiction should be available when essential to the protection of constitutional rights, and that its exercise should be governed by general principles rather than by rigid rules which would leave no room for the exercise of judgment by a District Court. In the course of his exposition of his general views, he referred to contrasting situations to illustrate a point that in the habeas corpus court some earlier adjudications are entitled to more weight than others. Speaking apparently of petitions for postconviction relief, he said that in some cases the state court "has held a hearing and rendered a decision based on specific findings of fact;" while, "[a]t the other pole is the perfunctory memorandum order denying a badly drawn petition and stating simply that the petitioner is not entitled to relief." His statement that a rehearing of the facts by the habeas corpus court in the former situation "would make only for burdensome and useless repetition of effort"[21] was not intended to be exclusive, for he was dealing in illustrative contrasts.

Was Mr. Justice Frankfurter of the opinion that a rehearing would be required in the habeas corpus court if the state court's findings were general rather than specific? Obviously not, for he joined the judgment of the Court that the District Court was not required to

17. The court's ruling does not appear *verbatim* in any of the published reports. In none of the published reports, however, is there any suggestion of specific findings resolving the factual controversy. An examination of the record confirms the fact that there were none. The finding was specific as to certain admitted facts, but was entirely general as to the facts in dispute.

18. See the opinion of the Court by Mr. Justice Reed, particularly the portion

under the heading "Right to Plenary Hearing," 344 U.S. 460, et seq., 73 S.Ct. 397.

19. § 44 U.S. 465, 73 S.Ct. 411.

20. See the concurring opinion of Mr. Justice Jackson, 344 U.S. 532, et seq., 73 S. Ct. 397.

21. 344 U.S. 504, 73 S.Ct. 444.

rehear the facts in the Brown case where the general finding that the confession was voluntary was unaccompanied by specific findings of the underlying facts insofar as those facts were in dispute.

I cannot agree that the Court in Thomas v. Arizona, 356 U.S. 390, 78 S.Ct. 885, 2 L.Ed.2d 863, "merely restated the usual appellate practice" on direct review rather than the effect of the prior adjudication when considered by the habeas corpus court. The case came up from the habeas corpus court, so that, in the Supreme Court, it was in the same posture as is this case in this Court. Nor can I agree that the issue of fact resolved by the state court's general finding that the confession was voluntary "was not a particularly significant one under the circumstances." It was crucial.[22]

With respect to that factual issue, the Supreme Court said, emphasis being the Court's:

" * * * Whatever the merits of this dispute, our inquiry clearly is limited to a study of the *undis-*

*puted* portions of the record. '[T]here has been complete agreement that any conflict in testimony as to what actually led to a contested confession is not this Court's concern. Such conflict comes here authoritatively resolved [against petitioner] by the State's adjudication.' Watts v. Indiana, 338 U.S. 49, 51–52 [, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801] (1949). Time and again we have refused to consider disputed facts when determining the issue of coercion. See Gallegos v. Nebraska, 342 U.S. 55, 60–61 [, 72 S.Ct. 141, 144–145, 96 L.Ed. 86] (1951); Haley v. Ohio, 332 U.S. 596, 597–598 [, 68 S.Ct. 302, 303, 92 L.Ed. 224] (1948); Ward v. Texas, 316 U.S. 547 [, 62 S.Ct. 1139, 86 L.Ed. 1663] (1942). The rationale behind such exclusion, of course, lies in the superior opportunity of trial court and jury to observe the witnesses and weigh the fleeting intangibles which may indicate truth or falsehood. We abide by the wisdom of that reasoning.

22. Thomas, suspected of murder, was discovered and arrested by the Sheriff of Cochise County, Arizona, heading a posse of 12 to 15 men. After Thomas was handcuffed by a state highway patrolman, a member of the posse, a mounted rancher lassoed Thomas around the neck and jerked him a few steps in the direction of the nearest trees. Later he was again lassoed by another mounted rancher and pulled to his knees. The Sheriff intervened and stopped these overt threats of lynching. However, in the State Court trial, the highway patrolman testified that when Thomas was roped the first time, the Sheriff said, "Will you tell the truth, or I will let them go ahead and do this." The Sheriff denied making the statement.

The next day Thomas orally admitted his guilt in the presence of a Justice of the Peace and of the Sheriff. Later two written confessions were taken, in each instance, in the presence of several armed men.

When these confessions were offered in the state trial court, a preliminary hearing was held in the absence of the jury. At its conclusion, the trial judge ruled the written confessions inadmissible. He found them involuntary because of the lynching threats and the presence of armed men when each of those confessions was taken. The earlier oral confession, he found to have been voluntary, however, because of the presence of the Justice of the Peace and of the Sheriff, who had been the defendant's protector. There was no doubt that the Sheriff had been the defendant's protector, but the trial judge made no specific finding on the conflicting testimony as to whether the Sheriff conditioned his protection upon the defendant's telling the truth.

In the habeas corpus proceeding, therefore, Thomas contended that the first oral confession was infected by the same threat which invalidated the subsequent written ones. The Sheriff, who was present, he contended, had told him under very dramatic circumstances that he would permit his lynching if he did not tell the truth. The ultimate conclusion that the oral confession was voluntary thus depended upon a resolution of the factual dispute over the Sheriff's words. As to that highly significant fact, there was no specific finding in the state trial court. There was only the general finding that the confession was voluntary.

"Petitioner has an alternative prayer that his case be remanded to the District Court for a plenary hearing on the issue of coercion. There is no merit, however, to his contention that the District Court erred in denying the writ on the basis of the record without a full hearing. The granting of a hearing is within the discretion of the District Court, Brown v. Allen, 344 U.S. 443, 463–465 [, 73 S.Ct. 397, 410–411, 97 L.Ed. 469] (1953), and no abuse of that discretion appears here." 356 U.S. 402–403, 78 S.Ct. 892.

Thus Thomas v. Arizona is an express holding that the factual dispute underlying the admissibility of the confession is resolved by the general finding of the state trial judge, the finding being conclusive upon the federal appellate courts in a later habeas corpus proceeding if the District Court accepted it as such. The District Court, on the other hand, has more latitude. It may accept the state court finding, or, in its discretion, it may reconsider the dispute and make its own findings. When there has been no abuse of that discretion, this Court has no right to say it must be exercised one way or the other.

The same approach was followed in the most recent case in the Supreme Court. In Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948, the District Court in the habeas corpus proceeding disregarded the evidence of physical brutality on the part of the police because of the general, entirely unspecific, finding of the state trial court that the confession was voluntary.[23] The Supreme Court proceeded on the same assumption, but found that the undisputed facts, as outlined by the District Court, disclosed coercion as a matter of law. No one suggested that the District Court wrongly exercised its discretion when it accepted the general finding of the trial court as determinative of the conflicting evidence of physical abuse.

Time and again, Courts of Appeals have held that a District Judge need not retry in a habeas corpus proceeding factual issues underlying the admission in evidence in a state criminal trial of a confession which the defendant claimed to have been coerced. In many of these cases, the rule is applied, as in the Supreme Court, when the state court finding was general only and without specific subsidiary findings as to disputed evidentiary facts.[24] The rule is applicable, of course, only if the question of the voluntary nature of the confession has been fairly heard in the state court and fairly resolved. Until today, however, there is no doctrine that specific determination of subsidiary facts in dispute is a prerequisite to such a conclusion that the state had fairly heard and determined the issue.

The cases in this Court, upon which the majority relies, are inapposite. They are close to the nether pole of which Mr. Justice Frankfurter spoke in Brown v. Allen when contrasting the extreme differences between state adjudications. Cases in which there was no finding in the state court do not bear upon the weight the habeas corpus court may give to a general finding of a state court made at the conclusion of a full evidentiary hearing when the complete record is before the habeas corpus court.

Thus in Holly v. Smyth, 4 Cir., 280 F.2d 536, the habeas corpus petition attacked a state court conviction. There were allegations of a denial of the right of counsel and of circumstances which would require recognition of the right of counsel under the doctrine of Betts

23. The finding is set out *verbatim* in footnote 1 of the dissenting opinion, 367 U.S. 450, 81 S.Ct. 1551.

24. United States v. La Vallee, 2 Cir., 279 F.2d 396; U. S. ex rel. Kulikauskas v. Murphy, 2 Cir., 293 F.2d 563; Application of Tune, 3 Cir., 230 F.2d 883; Stick-ney v. Ellis, 5 Cir., 286 F.2d 755; Wooten v. Bomar, 6 Cir., 267 F.2d 900; Wilson v. Sigler, 8 Cir., 285 F.2d 372; Muhlenbroich v. Heinze, 9 Cir., 281 F.2d 881; Schlette v. California, 9 Cir., 284 F.2d 827. And see Newsom v. Smyth, 4 Cir., 261 F.2d 452.

v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595. There had been an earlier habeas corpus proceeding in the state courts, but the record of those proceedings was not before the District Court. The District Court dismissed the petition for insufficiency. It did not rely upon any finding of the state court, for no finding of any kind was before it.[25] Necessarily, we reversed, but in doing so created no precedent for our disposition of this case.

United States ex rel. Sileo v. Martin, 2 Cir., 269 F.2d 586, is no less inapposite. A postconviction proceeding in the state court had been dismissed without explanation. The dismissal as readily could have been founded upon a legal conclusion of insufficiency of the allegations to require discharge as upon a disbelief of those allegations. It could not be said with any assurance that the state court's dismissal without explanation was a general finding of fact.

If that case be thought indicative of the view the Court of Appeals for the Second Circuit would take of the present situation, the thought should be dispelled by the later case of United States ex rel. Kulikauskas v. Murphy, 2 Cir., 293 F.2d 563. There it was held that the District Court was justified in accepting the general finding of the state court that the confession was voluntary and that a retrial in the habeas corpus court of the factual dispute was not necessary.

Here, in contrast to the cases cited by the majority, there was a finding. While it was unspecific as to the details of the underlying factual dispute, it was in such form that it commanded acceptance in every appellate court on direct review as a final determination of the facts. The full record of the proceedings in the state courts was reviewed by the habeas corpus court.

No one suggests that the issue of coercion was not fairly tried in the state court and fairly determined. There is nothing in those proceedings suggestive of a fatal flaw. The constitutional issue was not ignored. There was deliberate inquiry into it, and the trial court's disposition of the issue merited the affirmance it received on direct appeal.

I thus find in the decisions of the Supreme Court and of the Courts of Appeal commanding authority which requires affirmance here. I find no support for reversal. After a careful review of the entire record of the proceedings in the state courts, the District Court exercised the discretion vested in it to accept the state court's determination of the facts. It went further. It independently appraised the evidence offered in the murder trial and concurred in the state court's finding. If, in other circumstances, a District Court might be said to have abused its discretion in refusing to hear additional evidence,[26] no such abuse can be found when there was no such refusal.

The judgments of my brothers have my great respect. Whatever the infirmities of my own perception, however, when I find my judgment so much at odds with theirs as to a principle of great importance, I have a duty of dissent. I respond to that duty.

25. In this Court, an order entered in the habeas corpus proceedings in the Hustings Court of Portsmouth was tendered. It recited that counsel was present at the trial and that counsel appeared in Holly's behalf as well as for his co-defendants. The petition had alleged that his co-defendants were represented by counsel, a circumstance which was thought to have aggravated Holly's disadvantage in undertaking his own defense. An exhibit from the state trial court indicated that Holly had no counsel. Even in this Court, the full record of the proceedings in the Hustings Court was not produced. Had it been, whatever it revealed, it could not have saved the case, for this Court cannot perform the office of the District Judge.

26. See, however, the cases cited in footnote 2, supra.